[L.A. No. 29994. In Bank. Sept. 22, 1972.]

FRANK J. KLOPPING, JR., et al., Plaintiffs and Appellants, v.
CITY OF WHITTIER, Defendant and Respondent.

[L.A. No. 29995. In Bank. Sept. 22, 1972.]

CLIFFORD E. SARFF et al., Plaintiffs and Appellants, v.
CITY OF WHITTIER, Defendant and Respondent.

## COUNSEL

Thomas G. Baggot, Herbert Gall, John U. Gall, Fadem & Kanner and Gideon Kanner for Plaintiffs and Appellants.

Robert Flandrick, City Attorney, Martin & Flandrick and Stephen H. Galton for Defendant and Respondent.

John D. Maharg, County Counsel (Los Angeles), William F. Stewart, Deputy County Counsel, Adrian Kuyper, County Counsel (Orange), Robert F. Nuttman, Assistant County Counsel, Harry S. Fenton, Joseph A. Montoya, Robert L. Meyer, Hugh R. Williams and Jack M. Miller as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**MOSK, J.**—Plaintiffs Klopping and Sarff (plaintiffs) instituted separate actions in inverse condemnation for damages alleged to have been caused by activities of the City of Whittier (city) prior to the eventual condemnation of the property then owned by plaintiffs. After the trial court sustained the city's demurrers, judgments of dismissal were entered. Plaintiffs appeal.

On May 11, 1965, the city adopted a resolution to initiate proceedings designed to culminate in the formation of a parking district. Included among the properties to be condemned as part of those proceedings were parcels owned by plaintiffs. On November 10, 1965, the city initiated condemnation proceedings against the subject properties and parcels owned by third persons. Subsequently, the city directed that assessments be levied against certain individuals in order to pay costs involved in the establishment of the district. On February 23, 1966, one of the property owners to be assessed, Alpha Beta Acme Markets, Inc., filed a suit to enjoin the assessment. Judgment was against Alpha Beta in the trial court and on May 7, 1968, the Court of Appeal affirmed. (*Alpha Beta Acme Markets, Inc.* v. *City of Whittier* (1968) 262 Cal.App.2d 16 [68 Cal.Rptr. 327].)

On July 7, 1966, during the pendency of the Alpha Beta challenge, the city adopted a second resolution, reciting that: (1) because of the Alpha Beta suit, it was impossible to sell the bonds designed to finance the proposed parking facility; (2) by reason of the lack of funds from that source, the proposed acquisition of property could not proceed; (3) it was not "fair and equitable" to continue the restraining effect of the pending condemnation suit on the use of the properties sought to be condemned. The resolution then authorized the dismissal of the pending condemnation suits but declared the city's firm intention to reinstitute proceedings when and if the Alpha Beta matter was terminated in the city's favor.

On November 16, 1966, the condemnation suits against the properties owned by plaintiffs and others were dismissed. Contra to the contention of the city that the termination was a voluntary dismissal under Code of Civil Procedure section 581, the Court of Appeal ruled that it was, in law,

an "abandonment" under Code of Civil Procedure section 1255a. (*City of Whittier* v. *Aramian* (1968) 264 Cal.App.2d 683 [70 Cal.Rptr. 805].) Accordingly, the court allowed plaintiffs and other individuals to recover the costs they incurred as a result of the commencement of the condemnation proceedings and the subsequent abandonment, as provided under subdivision (c) of section 1255a.

On July 6, 1967, while both the *Alpha Beta* and *Aramian* suits were pending, plaintiffs Klopping and Sarff submitted to the city a claim for damages based on the original resolution of intent to condemn and on the resolution abandoning the condemnation proceeding but simultaneously announcing the city's intention to resume eminent domain action in the future. This claim was rejected and the present actions followed. Demurrers by the city were sustained without leave to amend as to any matters occurring prior to the dismissal of the original condemnation action but with leave to amend as to matters occurring thereafter. Plaintiffs chose not to amend, and judgments of dismissal were entered. Plaintiffs in both actions appeal and we have consolidated the proceedings for decision.

Plaintiffs seek to recover under inverse condemnation, one of two basic procedural devices for insuring that the constitutional proscription that "[p]rivate property shall not be taken or damaged for public use without just compensation having first been made to . . . the owner . . . " is not violated. (Cal. Const., art. I, § 14.) The other procedure is eminent domain, the significant difference being that in the latter the public authority takes the initiative whereas in the former it is the property owner who commences litigation. (3 Witkin, Summary of Cal. Law (7th ed. 1960) Constitutional Law, § 223, p. 2033.) The constitutional guarantee of compensation extends to both types of cases and not merely where the taking is cheap or easy; indeed the need for compensation is greatest where the loss is greatest. (Stoebuck, *Condemnation of Rights the Condemnee Holds in Lands of Another* (1970) 56 Iowa L.Rev. 293, 307.)

In either action the constitutional standard of "just compensation" remains the guide. In general that standard "is to be measured by the market value of the property . . ." at the time of the taking. (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 737 [123 P.2d 505]; see Code Civ. Proc., §1249.) "Market value," in turn, traditionally has been defined as "the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable." (*Sacramento etc. R. R. Co.* v. *Heilbron* (1909) 156 Cal. 408, 409 [104 P. 979].)

While expert witnesses testifying on behalf of the public authority and

those on behalf of the property owner may differ widely on their opinion as to the value of the property taken, this difference usually reflects the elusive nature of the fair market value concept and not the appropriate date on which valuation should be based. However, a variety of circumstances may actually becloud the proper valuation date. While in California this date is set by statute at the time the summons is issued (Code Civ. Proc., § 1249), depending on the nature of those activities occurring prior to the issuance of summons a different date may be required in order to effectuate the constitutional requirement of just compensation. (*Peacock v. County of Sacramento* (1969) 271 Cal.App.2d 845, 856 [77 Cal.Rptr. 391]; *Foster* v. *City of Detroit, Mich.* (E.D.Mich. 1966) 254 F.Supp. 655, 661-666, affd. (6th Cir. 1968) 405 F.2d 138; cf. *People* ex rel. *Dept. of Public Works* v. *Lillard* (1963) 219 Cal.App.2d 368, 377 [33 Cal.Rptr. 189].)

In analyzing the complexities inherent in a determination of the factors occurring prior to the statutory valuation date to be considered in the final award, the parties have concentrated on whether the precondemnation activities of defendant city were a "blight" on the subject properties or a "de facto taking" of those properties. (4 Nichols, The Law of Eminent Domain (3d ed. rev. 1971) § 12.3151[5]; *City of Buffalo* v. *J. W. Clement Co.* (1971) 28 N.Y.2d 241 [321 N.Y.S.2d 345, 356, 269 N.E.2d 895].)

At the onset we note that the actions of defendant did not constitute "condemnation blight" in the sense that blight describes the converse of the situation with which we were faced in *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478 [93 Cal.Rptr. 833, 483 P.2d 1]. In *Merced* we held that the value by which property was *enhanced* due to a public project, before it was reasonably expected that the parcel in question would in fact be taken by the project, should be included in the measure of just compensation. There the condemnation suit was filed in 1967 but plans for a massive redevelopment of the Lake McClure region had been announced as early as the late 1950s. "By 1962 the district had begun a quest for federal funds to assist in the financing of the project, and early in 1963 several newspaper articles informed the public that the completed Lake McClure project would include recreational facilities, such as camping, boating and fishing. The trial court found that about January 1, 1963 the public, while unaware of 'exactly what area, what spots were to be recreation,' did know of the general recreation plans, and that, as a result, property values in the area began to increase within a short time thereafter." (4 Cal.3d at p. 485.)

Because of this precondemnation activity concerning a project which would have a beneficial impact on a *general area,* property values in that

area tended to rise. We deemed that increase "project enhancement" and held that under appropriate circumstances the condemnee was entitled to include such enhancement in his measure of recovery. The converse of the situation in *Merced* is project, or condemnation, blight. Thus, under some circumstances an announcement that an undesignated parcel or parcels of land may be appropriated at some future time for a generally unappealing project may tend to decrease land values in the vicinity. (See Comment, *Condemnation Blight: Uncompensated Losses in Eminent Domain Proceedings—Is Inverse Condemnation the Answer?* (1972) 3 Pacific L.J. 571, 573.) For example, publicity that a refuse dump will be located somewhere within a 10-square-mile area may tend to depress the value of all land within that area because of the adverse impact a dump might have on other property in close proximity.

In the case at bar, however, the precondemnation publicity complained of consisted of announcements directly aimed at plaintiffs' properties and not at an undesignated area. We therefore are not concerned here with blight in terms of the converse of the circumstances presented in *Merced*. (*Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d at p. 483, fn. 1.)[1]

Having discarded the theory that the instant case involves blight, we turn to the type of damages sought by plaintiffs. While admittedly the pleadings are not a model of clarity on this point, it appears that plaintiffs claim the fair market value of their properties declined as a result of defendant's two announcements of intent to condemn made prior to instituting eminent domain proceedings.[2] They contend that because of the

---

[1]To allow recovery in every instance in which a public authority announces its intention to condemn some unspecified portion of a larger area in which an individual's land is located would be to severely hamper long-range planning by such authorities (cf. *Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d at p. 496, fn. 9), some of which may be required by state law (see generally Gov. Code, § 65101 et seq.). On the other hand, it would be manifestly unfair and violate the constitutional requirement of just compensation to allow a condemning agency to depress land values in a general geographical area prior to making its decision to take a particular parcel located in that area. (See 4 Nichols, *supra,* § 12.3151[2] at pp. 328-329; cf. *Buena Park School Dist.* v. *Metrim Corp.* (1959) 176 Cal.App.2d 255, 258-259 [1 Cal.Rptr. 250].) The length of time between the original announcement and the date of actual condemnation may be a relevant factor in determining whether recovery should be allowed for blight or for other oppressive acts by the public authority designed to depress market value. (Cf. *Foster* v. *City of Detroit, Mich., supra,* 254 F.Supp. 655, 661-666.)

[2]The first announcement was made on May 11, 1965, after which actions in eminent domain were commenced. These proceedings were terminated on November 16, 1966, after the city had announced on the previous July 7 that even though it would dismiss the pending actions, condemnation proceedings would be reinstituted

condemnation cloud hovering over their lands, they were unable to fully use their properties and that this damage, reflected in loss of rental income, should be recoverable.

The city insists that plaintiffs are not entitled to recover for losses caused by the precondemnation announcements because during the period between the public statements and the taking of the properties there was neither physical invasion of plaintiffs' lands nor any direct interference with the condemnees' possession and enjoyment of their lands. Such an assertion contains the implication that plaintiffs seek recovery under a "de facto taking" theory.

In de facto taking cases, the landowner claims that because of particularly oppressive acts by the public authority the "taking" actually has occurred earlier than the date set by statute (Code Civ. Proc., § 1249). (See *Foster* v. *City of Detroit, Mich., supra,* 254 F.Supp. 655.) The prevailing rule, as stated recently by the New York Court of Appeals in *City of Buffalo* v. *J. W. Clement Co., supra,* 321 N.Y.S.2d 345, 356, is that before a de facto taking results there must be a "physical invasion or direct legal restraint. . . ." (See also 4 Nichols, *supra,* § 12.3151[5], at p. 336.) One example of a "legal restraint" discussed in several California cases has been a particularly harsh zoning regulation, often calculatingly designed to decrease any future condemnation award. (*Peacock* v. *County of Sacramento, supra,* 271 Cal.App.2d 845, 856, 862-864; *Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205, 209-211 [32 Cal.Rptr. 318]; *Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 458-460 [327 P.2d 10].)

However, a fundamental difference arises between the relief sought in de facto taking situations and that sought here. In the former, the owner claims his property has been *taken* on the earlier date; thus all decline in value after that date is chargeable to the condemner. This would include damages wholly unrelated to the precondemnation activity of the public agency. For example, losses due to a general decline in market value in the area or to the adverse consequences of a natural disaster would be borne by the condemner since the *taking* of the property is said to have occurred at the earlier date.

In the instant case, however, plaintiffs do not contend that the subject properties should be treated as if they were actually condemned on either May 11, 1965, or July 7, 1966. The date of the taking, at least for plaintiff

at some later date. On August 21, 1969, a second condemnation suit was brought against plaintiff Klopping. Plaintiff Sarff lost his property through foreclosure on May 16, 1968; his successor sold it to the city.

Klopping (see fn. 2), remains the date the summons was issued. Rather plaintiffs submit that any decrease in the market value caused by the pre-condemnation announcements should be disregarded and that the property should be valued without regard to the effect of the announcements on the property. Under this contention, any decline in the market value of the properties caused by general conditions unrelated to the activities of the condemner would be shouldered by the landowner.

The relevant issues in a de facto taking situation are significantly distinct from those arising when the claim is that the adverse economic effect of precondemnation publicity on the proposed taking should be disregarded. The valuation issue to be resolved in normal eminent domain proceedings (*Sacramento etc. R. R. Co.* v. *Heilbron, supra,* 156 Cal. 408, 409) is wholly unrelated to determination of the issue of activities by the condemner which constitute a taking of the property even though no summons has been issued.

The earliest pronouncement on the subject of the effect to be given to announcements of proposed condemnation in determining just compensation appears to have come from the Court of Appeal in *Atchison, Topeka and Santa Fe Ry. Co.* v. *Southern Pacific Co.* (1936) 13 Cal.App.2d 505 [57 P.2d 575], disapproved on other grounds in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680]. There the court upheld the trial judge's refusal to permit the condemnee to inquire into any decrease in the market value between precondemnation announcements and the institution of the eminent domain action.

"It is appellants' contention that the commission's order of July 8, 1927, was an important element to be employed by anyone seeking to determine the market value *as of the date of filing the complaint herein,* namely, December, 1933, in that the very order itself, becoming known, retarded this area, i.e., 'stigmatized' it, and affected its market value. The law does not, however, lend a willing ear to speculation. While appellants may have evidenced change for the worse in the demand for real estate there between July, 1927, and October 4, 1933, when the commission issued its decision 26399, approving the Plaza Set Back Plan, yet the trial court would have permitted an indulgence in unfathomable speculation had it opened the road to the examination of witnesses, using the order of July, 1927, and said Plan 4-B as a basis in order to determine whether there was a slump in the market in this area, and if so, what it was due to, during that period. Appellants' statement: 'In other words, appellants were entitled to have the market value of this land determined as if the decision of the commission never had existed,' to us is paradoxical. The market value is

an effect and we are not governed by the cause that brings it about in order to determine it." (13 Cal.App.2d at p. 517.)

In support of its decision, the court in *Atchison* relied on our early case of *San Diego Land etc. Co.* v. *Neale* (1888) 78 Cal. 63 [20 P. 372]. In *Neale* defendant's land was being taken as a reservoir site in connection with the construction of a dam on a neighboring tract. At trial, the condemnee asked his appraiser to evaluate the land on the basis of its worth as a reservoir site. On appeal, we held this question improper, stating: "it seems monstrous to say that the benefit arising from the proposed improvement is to be taken into consideration as an element of the value of the land." (78 Cal. at p. 75.)

This statement, which unfortunately spawned the development of the project enhancement doctrine prior to our decision in *Merced,* was in reality nothing more than a declaration of "the firmly established premise that 'compensation is based on loss imposed on the owner, rather than on benefit received by the taker. [Citations.] The beneficial purpose to be derived from the condemner's use of the property is not to be taken into consideration in determining market values, for it is wholly irrelevant.'" (*Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d at p. 491.)

The court in *Atchison* nevertheless seized on the above-quoted language from *Neale* and rhetorically asked: "If the benefits may not be considered, why consider the detriment? A value so derived is too remote and speculative." (13 Cal.App.2d at p. 518.)

Thus the seminal case in the field of loss occasioned by precondemnation announcements relied on two factors in rejecting recovery: (1) what it perceived to be persuasive authority from this court in an analogous area; and (2) the concern that testimony on the effect of public announcements on market value would be speculative. We reject this rationale on both counts.

The court in *Atchison* viewed *Neale* as standing for the proposition that an increase in market value occasioned by the announcement of a condemnation project was to be disregarded. Therefore, it reasoned, *evidence* on any decrease in value caused by the announcement must likewise be disallowed. However, that conclusion is in fact the *converse* of the necessary corollary to the holding in *Neale*. Since *Neale* held that increases due to precondemnation publicity should be disregarded it follows that where there is decline in value such decreases are likewise to be disregarded. This can be accomplished only by *allowing* testimony as to what decline, if any, was due to any announcements made prior to condemnation. (Andersen, *Consequences of Anticipated Eminent Domain Proceedings—Is*

*Loss of Value a Factor?* (1964) 5 Santa Clara Law. 35, 38; see also Comment, *Condemnation Blight: Uncompensated Losses in Eminent Domain Proceedings—Is Inverse Condemnation the Answer?, supra,* 3 Pacific L.J. at pp. 582-583.)

The second consideration prompting the court in *Atchison* to disallow evidence as to the decline in value occasioned by such publicity was its concern over the speculative quality of the evidence. However, in the field of appreciation in value, the condemnee is put to a similar task in being required to ferret out various factors affecting market value. Indeed, under the rule set forth in *Merced* the burden on the condemnee is doubly difficult. First of all, he must prove that it was not "reasonably foreseeable" that the parcel involved would be included in the project from the beginning. (4 Cal.3d at p. 497.) Such a standard, while legally sound, will undoubtedly give rise to testimony based on some element of speculation. Furthermore, if it was reasonably foreseeable that the property was to be included in the original project, and yet the owner seeks to demonstrate the presence of nonproject increases in market value over the same period, we must distinguish between appreciation caused by the project and appreciation caused by nonproject variables. (See generally *City of Pasadena* v. *Union Trust Co.* (1934) 138 Cal.App. 21, 27 [31 P.2d 463], disapproved on other grounds in *Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d at p. 495.) There is no more speculation inherent in distinguishing between project and nonproject depreciation than there is between project and nonproject appreciation. (Andersen, *Consequence of Anticipated Eminent Domain Proceedings—Is Loss of Value a Factor?, supra,* 5 Santa Clara Law. at pp. 43-46.)

Since the condemnee has the burden of proving damages (*San Francisco* v. *Tillman Estate Co.* (1928) 205 Cal. 651, 653 [272 P. 585]; *People* ex rel. *Dept. of Pub. Wks.* v. *Younger* (1970) 5 Cal.App.3d 575, 579 [86 Cal.Rptr. 237]), requiring the condemnee to lay a proper foundation in these matters (*People* ex rel. *Dept. of Public Works* v. *Lillard, supra,* 219 Cal.App.2d 368, 377) and properly instructing the jury should adequately circumscribe speculation and render unnecessary a rule of exclusion created from apprehension of speculation. (Webber, *The Lost Identity of Blight* (1970) 45 State Bar J. 492, 495-496.)

Because *Atchison's* conclusion to disallow testimony on decline in market value occasioned by precondemnation announcements rested on a dubious premise and overemphasized the speculation inherent in such testimony, that case and subsequent cases based thereon (*City of Oakland* v. *Partridge* (1963) 214 Cal.App.2d 196, 202-203 [29 Cal.Rptr. 388];

*People* v. *Lucas* (1957) 155 Cal.App.2d 1, 5-7 [317 P.2d 104]) are no longer controlling and are disapproved.

Instead we adopt the rule implicitly approved by the Court of Appeal in *People* ex rel. *Dept. of Public Works* v. *Lillard, supra,* 219 Cal.App.2d 368 and *Buena Park School Dist.* v. *Metrim Corp., supra,* 176 Cal.App.2d 255.

In *Lillard* the state sought to condemn land for widening a freeway and for building a frontage road, thereby cutting off defendant's direct access to the main throughway. Defense counsel was not permitted to ask a state witness about the depreciation in value due to the threat of condemnation. On appeal the court found that defendant had failed to lay a sufficient foundation for such a question because there was no evidence as to any threat of condemnation or any damages caused thereby. However, the Court of Appeal then declared (at p. 377): "Properly framed and with a foundation-laid inquiry, cross-examination of an adverse witness on this subject would have been proper. Although there appears to be a conflict of authority on whether 'market value' is still the yardstick of just compensation when it is established that a depressed market for the property is created by a proposed condemnation (see 1 Orgel on Valuation Under Eminent Domain, p. 449), at least one California case has said that the trial court 'could have, within the limitations of sound legal and equitable principles, advised the jury that they should treat the property as having the value that it would have had, had no preliminary action been taken by the board toward the acquisition of the property.' [Citation.]"

In the *Buena Park School Dist.* case the matter was presented somewhat differently. There defendant landowner sought to introduce evidence as to the availability of his parcel for subdivision purposes. The Court of Appeal, in an appeal by the school district, held that the subdivision element was properly included in the market value instruction even though it was obvious that defendant could not subdivide because eminent domain proceedings were threatened. The court, after quoting the definition of market value contained in *Sacramento etc. R. R. Co.* v. *Heilbron, supra,* 156 Cal. 408, 409, stated: "This classic definition of market value contemplates, of course, the price which the property would have brought at the time of valuation had it then been placed upon the market and had it then been available for sale. It is obvious that in determining that value the trier of fact must disregard the fact that at that time because of the filing of condemnation proceedings the property was not actually salable. It is a matter of common knowledge that a purchaser would not buy property in the process of being condemned except at a figure much below its actual value. It follows, therefore, that in arriving at the fair market

value it is necessary that the jury should disregard not only the fact of the filing of the case but should also disregard the effect of steps taken by the condemning authority toward that acquisition. To hold otherwise would permit a public body to depress the market value of the property for the purpose of acquiring it at less than market value." (176 Cal.App.2d at pp. 258-259; see also *U.S.* v. *Virginia Electric Co.* (1961) 365 U.S. 624, 636 [5 L.Ed.2d 838, 849, 81 S.Ct. 784].)

We agree in principle with this statement.[3] However, we are also aware that to allow recovery under all circumstances for decreases in the market value caused by precondemnation announcements might deter public agencies from announcing sufficiently in advance their intention to condemn. The salutary by-products of such publicity have been recognized by this court (*Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d at p. 496, fn. 9); plaintiffs likewise agree that a reasonable interval of time between an announcement of intent and the issuance of the summons serves the public interest. Therefore, in order to insure meaningful public input into condemnation decisions, it may be necessary for the condemnee to bear slight incidental loss.[4] However, when the condemner acts unrea-

---

[3]It is worthy to note that a similar rule has been adopted by the Legislature for the purposes of achieving just compensation when property is taken by negotiated sale rather than by eminent domain. Government Code section 7267.2 provides: "Before the initiation of negotiations for real property, the public entity shall establish an amount which it believes to be just compensation therefor, and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the public entity's approved appraisal of the fair market value of such property. Any decrease or increase in the fair market value of real property to be acquired prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner or occupant, will be disregarded in determining the compensation for the property. The public entity shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount it established as just compensation. Where appropriate, the just compensation for the real property acquired and for damages to remaining real property shall be separately stated."

[4]We note that for purposes of a negotiated sale Government Code section 7267.2 (see fn. 3, *supra*) does not require a finding of unreasonable action before decreases caused by "the likelihood that the property would be acquired" are to be disregarded. However, the Legislature may by statute include in the final award certain costs and expenses not required by the Constitution. (Cf. *County of Los Angeles* v. *Ortiz* (1971) 6 Cal.3d 141, 144-145 [98 Cal.Rptr. 454, 490 P.2d 1142]; compare *Central Pacific R. Co.* v. *Pearson* (1868) 35 Cal. 247, 263, overruled on other grounds in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680]; *Town of Los Gatos* v. *Sund* (1965) 234 Cal.App.2d 24, 28 [44 Cal.Rptr. 181], with Gov. Code, § 7262 [moving expenses]; and *County of Los Angeles* v. *Ortiz, supra,* 6 Cal.3d 141, 143 fn. 2, 148-149 with Code Civ. Proc., § 1246.3 [attorneys' fees and appraisal costs].)

Furthermore, section 7267.2 explicitly refers to acquisition of public property by

sonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property so as to measure the fair market value as of a date earlier than that set statutorily by Code of Civil Procedure section 1249. Under our conclusion here in most instances the valuation date remains fixed at the date of the issuance of the summons. Thus a public authority is not required to compensate a landowner for damages to his property occurring after the announcement if the injury is not unreasonably caused by the condemning agency; interest is likewise to run not from the announcement but from the valuation date. (4 Nichols, *supra*, § 12.3151[5], at p. 344; *City of Buffalo v. J. W. Clement Co., supra,* 321 N.Y.S.2d at pp. 356-357.)

Accordingly we hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value.[5]

---

negotiated sale rather than by eminent domain. In view of the legislative command that negotiated sales are to be favored over condemnation suits for a variety of policy reasons (see Gov. Code, § 7267), it is understandable that in order to acquire property by agreement the state might be more generous than is required under the Constitution.

[5] Our holding thus does not cast doubt on the validity of the decision in *Silva* v. *City & County of San Francisco* (1948) 87 Cal.App.2d 784 [87 Cal.Rptr. 784, 198 P.2d 78]. There the plaintiff sued for declaratory relief, seeking a determination that if his property was worth $10,000 at the time the board of supervisors announced its intent to condemn he would automatically be entitled to $10,000 at the time the condemnation suit was actually commenced. The court denied relief. Only if it is concluded that a de facto taking in the traditional sense has occurred would the valuation date be moved up as was sought by the plaintiff. Only in unusual circumstances would an announcement of intent to condemn constitute a de facto taking.

In *Bank of America* v. *County of Los Angeles* (1969) 270 Cal.App.2d 165 [75 Cal.Rptr. 444], a deputy county counsel appeared at a probate sale and announced that the board of supervisors had adopted a resolution to condemn the parcel in question. Plaintiffs complained that this announcement stifled the bidding process. They sought to recover the difference between the price at which the property was sold and the anticipated higher bid. The Court of Appeal rejected this claim. To the extent the decision holds that losses occasioned by an announcement of intent to condemn are not recoverable (see 270 Cal.App.2d at p. 177), it is disapproved. However, we note that the speculative nature of "anticipated bids" is such that the case presented matters not currently before us.

Finally, in *Hilltop Properties* v. *State of California* (1965) 233 Cal.App.2d 349 [43 Cal.Rptr. 605, 37 A.L.R.3d 109], the plaintiff claimed that the state had requested that it exclude two strips of land from its proposed subdivision plan so that a freeway

Here plaintiffs seek to prove at trial that the fair market value of their properties was diminished because of the precondemnation statements issued by defendant city. Specifically they allege that they were unable to fully use their properties and suffered a loss of rental income.[6] ▉ It has long been established that rent is an appropriate criterion for measuring fair market value. (4 Nichols, *supra,* §§ 12.312, 12.3122.) "[I]f property is rented for the use to which it is best adapted, the actual rent reserved, capitalized at the rate which local custom adopts for the purpose, forms one of the best tests of value . . . ." (4 Nichols, *supra,* § 12.3122, at p. 169.) On the date on which an announcement of future intent to condemn is made, the market value may properly be measured by the anticipated rental income to be received throughout the lifetime of the property. If as a result of precondemnation statements rental income is lost, the anticipated rental income would be diminished and a decline in the fair market value would follow. While we reiterate that the valuation date set statutorily at the issuance of the summons remains intact, if the steps taken toward condemnation are to be disregarded when the condemner acts unreasonably, the condemnee must be compensated for loss of rental income attributable to such precondemnation publicity. Rental losses occasioned by a general decline in the property value or by a natural disaster occurring prior to the date of taking must, however, be borne by the property owner.

Compensation for loss of rental income caused by an announcement of future condemnation action has been recently allowed by the Supreme Court of Wisconsin in *Luber* v. *Milwaukee County* (1970) 47 Wis.2d 271 [177 N.W.2d 380]. There appellants complained that the imminence of condemnation proceedings caused a principal tenant not to renew his lease. In holding that the condemnee could recover for loss of rental income for the period between the announcement and the time the suit was filed, the court stated: "We think that under property concepts one's interest in rental income is such as to deserve compensation under the 'just compensation' provision of the Wisconsin Constitution. In the instant case it is undisputed that the pendency of the condemnation was the sole cause of the appellants' rental loss. . . . [¶] The importance of allowing recovery for incidental losses has increased significantly since condemnation powers

---

could be widened. While recovery for inverse condemnation was denied, it should be noted that at no time did the state formally announce its intention to condemn. Furthermore, relief was granted on a promissory estoppel theory.

[6]No claim is made that as a result of the threat of condemnation the properties or any buildings deteriorated to such a degree that the holdings became virtually worthless. (Cf. *Foster* v. *City of Detroit, Mich., supra,* 254 F.Supp. 655, 661-666; see Webber, *The Lost Identity of Blight, supra,* 45 State Bar J. at pp. 493-494.)

were initially exercised in this country. During the early use of such power, land was usually undeveloped and takings seldom created incidental losses. Thus the former interpretation of the 'just compensation' provision of our constitution seldom resulted in the infliction of incidental losses. The rule allowing fair market value for only the physical property actually taken created no great hardship. In modern society, however, condemnation proceedings are necessitated by numerous needs of society and are initiated by numerous authorized bodies. Due to the fact people are often congregated in given areas and that we have reached a state wherein *re*-development is necessary, commercial and industrial property is often taken in condemnation proceedings. When such property is taken, incidental damages are very apt to occur and in some cases exceed the fair market value of the actual physical property taken. . . . [¶] We believe that one's interest in rental loss is such as is required to be compensated under the 'just compensation' clause . . . . Sec. 32.19(4), Stats., insofar as it limits compensation for the taking of such interest is in conflict with the state constitution. The rule making consequential damages *damnum absque injuria* is, under modern constitutional interpretation, discarded . . . ." (177 N.W.2d at pp. 384-385, 386; cf. *Jacksonville Express. Auth.* v. *Henry G. Du Pree Co.* (Fla. 1958) 108 So.2d 289, 291, 292 [69 A.L.R.2d 1445].)[7]

Plaintiffs here have alleged that defendant's actions were unreasonable and performed for the purpose of depressing the fair market value and preventing plaintiffs from using their land. Defendant announced on two separate occasions its intent to condemn. The first resolution was adopted May 11, 1965; the second on July 7, 1966, at which time defendant abandoned eminent domain proceedings for the stated reason that it was not "fair and equitable" to maintain the cloud of condemnation over property owned by plaintiffs and others during the Alpha Beta challenge. Yet, in the same resolution the city recreated a cloud by announcing its intent to reinstitute condemnation proceedings if the Alpha Beta matter was re-

---

[7]The Wisconsin Supreme Court characterized the damages suffered by the appellant in *Luber* as "incidental." This is accurate in the sense that they are not occasioned by the fact of condemnation but on activity engaged in by the public agency prior to condemnation. However, we note that recovery of lost rental income relates directly to the fair market value of the property and hence is distinguishable from such traditional incidental damages as, for example, moving expenses. (4 Nichols, *supra*, § 13.32.) In California, moving expenses are excluded from the constitutional requirement of just compensation (*Central Pacific R. Co.* v. *Pearson, supra*, 35 Cal. 247, 263; *Town of Los Gatos* v. *Sund, supra*, 234 Cal.App.2d 24, 28) but are compensable under some circumstances by statute (Gov. Code, § 7262). Similarly, recovery for expert witness and attorneys' fees is not compelled constitutionally (*County of Los Angeles* v. *Ortiz, supra*, 6 Cal.3d 141, 143, fn. 2, 148-149) but is authorized in some limited instances by statute (Code Civ. Proc., § 1246.3).

solved in the city's favor. This latter declaration appears to have no discernible relation to a desire to insure public input into the decision-making process since, presumably, discussion on the advisability and location of a parking district occurred at the time of the May 11, 1965, announcement. In any event, whether there was unreasonable delay or whether the July 7 announcement itself constituted unreasonable action on the part of defendant is a question of fact.

We now turn to additional complexities in this case. The city contends that since plaintiffs did not seek to set aside the abandonment of the initial condemnation proceedings, they are bound by Code of Civil Procedure section 1255a.[8] Under the city's argument, plaintiffs are thus limited to recovering only their costs and disbursements pursuant to subdivision (c) of that section. Plaintiffs were awarded their costs by the Court of Appeal in *City of Whittier* v. *Aramian, supra,* 264 Cal.App.2d 683.

Section 1255a, subdivision (c), provides, in part: "Upon the denial of a motion to set aside such abandonment or, if no such motion is filed, . . . a judgment shall be entered dismissing the proceeding and awarding the defendants their recoverable costs and disbursements." █ The statute does not provide recovery for decreases in market value caused by precon-

---

[8]Section 1255a provides in part: "(a) The plaintiff may abandon the proceeding at any time after the filing of the complaint and before the expiration of 30 days after final judgment, by serving on defendants and filing in court a written notice of such abandonment. Failure to comply with Section 1251 of this code shall constitute an implied abandonment of the proceeding. (b) The court may, upon motion made within 30 days after such abandonment, set aside the abandonment if it determines that the position of the moving party has been substantially changed to his detriment in justifiable reliance upon the proceeding and such party cannot be restored to substantially the same position as if the proceeding had not been commenced. (c) Upon the denial of a motion to set aside such abandonment or, if no such motion is filed, upon the expiration of the time for filing such a motion, on motion of any party, a judgment shall be entered dismissing the proceeding and awarding the defendants their recoverable costs and disbursements. Recoverable costs and disbursements include (1) all expenses reasonably and necessarily incurred in preparing for the condemnation trial, during the trial, and in any subsequent judicial proceedings in the condemnation action and (2) reasonable attorney fees, appraisal fees, and fees for the services of other experts where such fees were reasonably and necessarily incurred to protect the defendant's interests in preparing for the condemnation trial, during the trial, and in any subsequent judicial proceedings in the condemnation action, whether such fees were incurred for services rendered before or after the filing of the complaint. In case of a partial abandonment, recoverable costs and disbursements shall include only those recoverable costs and disbursements, or portions thereof, which would not have been incurred had the property or property interest sought to be taken after the partial abandonment been the property or property interest originally sought to be taken. Recoverable costs and disbursements, including expenses and fees, may be claimed in and by a cost bill, to be prepared, served, filed, and taxed as in civil actions. Upon judgment of dismissal on motion of the plaintiff, the cost bill shall be filed within 30 days after notice of entry of such judgment."

demnation publicity. But since our decision here is based on constitutional principles the fact that section 1255a is silent on damages does not foreclose consideration of the subject. ■ While the city seeks to cast the failure to set aside the abandonment as an election of remedies, thereby precluding additional compensation, it appears that the procedure set forth in section 1255a does not bear on the issue of whether an individual whose property was once singled out for condemnation is able to recover the diminution in market value caused by an announcement of the public authority's intent to condemn.

Section 1255a, subdivision (a), permits the condemning agency to abandon eminent domain proceedings "any time after the filing of the complaint and before the expiration of 30 days after final judgment. . . ." Thus the statute contemplates instances in which the governmental entity proceeds to judgment and yet elects not to convert private property to public use. The section, therefore, provides the flexibility necessary to protect the public plaintiff from being required to take property it no longer needs.

However, the provision is manifestly open to abuse and for that reason subdivisions (b) and (c) provide some protection for property owners. Subdivision (b) allows the defendant to set aside the abandonment on estoppel principles if the position of the defendant "has been substantially changed to his detriment in justifiable reliance" upon the condemnation action. (Cf. *McGee* v. *City of Los Angeles* (1936) 6 Cal.2d 390, 392 [57 P.2d 925] [demolished building].)

In those instances in which there has been no detrimental reliance, subdivision (c) compensates the property owner for some of his costs and expenses in anticipation of an eminent domain trial. The provision does not attempt to deal with losses due to a decline in the market value or other damages to the property. (*Merced Irrigation Dist.* v. *Wollstenhulme, supra,* 4 Cal.3d 478, 505; *La Mesa-Spring Valley School Dist.* v. *Otsuka* (1962) 57 Cal.2d 309, 312-314, 315-318 [19 Cal.Rptr. 479, 369 P.2d 7].) "The statute operates to prevent the condemner, within reasonable limits, from prosecuting successive claims [citations], and to protect innocent owners against expenses to which they may be put in preparing a defense which has become unnecessary because the condemner for any reason chooses to give up the intended taking [citation]." (*Frustuck* v. *City of Fairfax* (1964) 230 Cal.App.2d 412, 417 [41 Cal.Rptr. 56].)

In fact when the Court of Appeal concluded that plaintiffs here and others were entitled to costs and expenses under subdivision (c), it noted that under "the language of the statute it is not the condemnation *project* which must be abandoned, but rather the *action* in which costs and fees have been incurred." (*City of Whittier* v. *Aramian, supra,* 264 Cal.App.2d

683, 686; italics added.) Conversely, insofar as losses occasioned by precondemnation announcements are concerned, these losses occur irrespective of whether eminent domain proceedings are eventually instituted. Thus, while recovery for costs and disbursements under section 1255a relates primarily to the filing of the complaint and not the precondemnation announcement of intent, recovery for a decline in the fair market value relates principally to the announcement and not to the filing of the action. Accordingly, we conclude that the statute does not require a property owner to elect one of two alternative remedies.

Our conclusion is supported by recent legislation in this area. Section 1243.1 of the Code of Civil Procedure states, in part: "In any case in which a public entity . . . which possesses the power of eminent domain establishes by resolution or ordinance the necessity to acquire a particular parcel or parcels of real property by eminent domain, and such public entity does not thereafter initiate, within six months, an action in eminent domain to take such parcel, the owner of the parcel may bring an action in inverse condemnation requiring the taking of such parcel and a determination of the fair market value payable as just compensation for such taking. In such inverse condemnation action, the court may, in addition, *or in the alternative,* if it finds that the rights of the owner have been interfered with, award damages for any such interference by the public entity." (Italics added.)

This provision recognizes that an action in eminent domain frequently is not filed within six months of a public entity's announcement of intent to condemn. Under such circumstances a property owner may bring an action to require the taking of his property and "in addition, or in the alternative" be awarded damages. Section 1243.1 obviously contemplates, for example, that in some instances a precondemnation statement will interfere so substantially with the right of a property owner to lease his land that after six months the owner should be able to recover for such interference irrespective of whether the property is taken. In fact subdivision (3) of section 1243.1 provides that the above-quoted statutory language "shall not affect a public entity's authority to . . . abandon the condemnation action." Thus recovery for loss of rental income after the condemner has excessively delayed bringing an action in eminent domain or has otherwise acted unreasonably is permitted irrespective of whether condemnation proceedings are abandoned or whether they are instituted at all.[9]

---

[9]Section 1243.1 requires a property owner to wait six months after a resolution or ordinance of intent to condemn is passed before he may bring an inverse condemnation action. We do not decide whether the Legislature intended that any delay of less than six months is per se reasonable or whether it enacted the waiting period to provide public entities with a minimum period of time in which to negotiate a purchase

Both plaintiffs here seek to recover damages in inverse condemnation and not as part of an eminent domain award. The city contends that since neither currently owns the property they are each barred. With regard to plaintiff Klopping, the city asserts that since his land was taken in a second condemnation action which proceeded to judgment he should have claimed the damages he now seeks as part of his eminent domain award. We agree.

■ While it is true that Klopping did bring his inverse condemnation suit before the city instituted its second condemnation action[10] the eminent domain action proceeded to final judgment first. Since Klopping could have claimed his loss of rental income, if any, occasioned by the two precondemnation announcements in the eminent domain suit, he is barred from seeking those damages in inverse condemnation once the condemnation proceeding becomes final. "Where two actions involving the same issue are pending at the same time, it is not the final judgment in the first suit, but the first final judgment, although it may be rendered in the second suit, that renders the issue res judicata in the other court." (*Domestic & Foreign Pet. Co., Ltd.* v. *Long* (1935) 4 Cal.2d 547 562 [51 P.2d 73]; 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 166.) Had the city abandoned its condemnation action for a significant period of time so that the inverse condemnation action proceeded to judgment first, any recovery there would bar a duplicate award for the same damage when eminent domain proceedings were subsequently reinstituted.

■ Plaintiff Sarff filed his inverse condemnation suit on March 26, 1968. On the following May 16, he lost his property through foreclosure. Certainly this fortuity does not preclude him from recovering for any damages caused by the city in making the two announcements in question. Sarff complains that he was unable to rent the property in the period following the precondemnation announcements. Under the rules discussed above rental loss is a proper element of recovery. In the petition for hearing filed herein, it also appears that he seeks recovery for damages occasioned by the fact that his property was ultimately foreclosed because the condemnation resolution prevented him from deriving income from his land in order to make mortgage payments. The availability of this element of damage can be more fully explored on remand.

of the property and thus avoid litigation altogether. (Cf. *Luber* v. *Milwaukee County. supra,* 177 N.W.2d 381, 382-383 [statute limiting the right to recover rental loss to one year prior to taking].) We do note that in the last two years the Legislature has enacted comprehensive legislation designed to decrease the number of condemnation suits. (Stats. 1971, ch. 1574, §§ 10-15, at pp. 3160-3162.) In any event, plaintiffs here waited more than six months after defendant's second announcement of intent before bringing the present actions.

[10]The instant case was filed on December 22, 1967. The city filed its second condemnation suit against Klopping on August 21, 1969.

The judgment dismissing the action brought by plaintiff Klopping in No. 29994 is affirmed and the judgment dismissing the action brought by plaintiff Sarff in No. 29995 is reversed and remanded for proceedings consistent with the views hereinabove expressed. Plaintiffs in both cases are to recover costs (*People* ex rel. *Dept. Pub. Wks.* v. *International Tel. & Tel. Corp.* (1972) 26 Cal.App.3d 549 [103 Cal.Rptr. 63]).

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

The petitions of appellants Klopping and respondent City of Whittier for a rehearing were denied October 18, 1972.