Filed 8/14/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE ex rel. DEPARTMENT OF TRANSPORTATION, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> MICHAEL R. MCNAMARA et al., <br><br> Defendants and Respondents. | H036228 <br> (Monterey County <br> Super. Ct. No. M92076) |

Appellant The People ex rel. Department of Transportation (DOT) challenges the trial court's rulings in an eminent domain action in which DOT took a residential property from respondents Michael and Rosealinda McNamara. DOT contends that the trial court erred in (1) finding that DOT was liable for precondemnation damages, (2) granting judgment notwithstanding the verdict (JNOV) on the amount of precondemnation damages, and (3) awarding litigation expenses to the McNamaras. We conclude that the McNamaras failed to introduce substantial evidence that they were entitled to recover precondemnation damages. Consequently, both the judgment and the award of litigation expenses, which depended on the McNamaras' entitlement to precondemnation damages, must be reversed.

## I. Factual Background

The McNamaras bought a 1.24-acre lot in Prunedale near Highway 101 in 1982. They planted trees along the border of the property to shield the view of the highway in

anticipation of building a home on the lot. In 2002, when Michael McNamara was nearing his retirement from the military, they began planning the home they would build on the lot. The McNamaras attended a meeting held by DOT concerning a long-considered freeway bypass project. They learned that the bypass project lacked funding. The McNamaras sent a letter to DOT asking it to keep them apprised of any developments impacting their property.

In December 2002, DOT determined that the Prunedale Improvement Project (PIP) "was the way to go" with respect to improving Highway 101 in the Prunedale area. DOT began the environmental review process for the PIP. In January 2003, DOT sent the McNamaras a letter apprising them that serious funding issues remained regarding the bypass project. The McNamaras proceeded with construction of their new home on the lot, breaking ground in November 2003.

In October 2003, unbeknownst to the McNamaras, DOT held a public meeting about the PIP. Despite the McNamaras' prior request to be kept apprised, DOT did not notify them of this meeting. The PIP had been designed using a 1999 aerial survey that did not reflect the existence of the McNamaras' home. The proposed right of way for the PIP bisected the McNamaras' home. DOT's December 2003 draft relocation study identified the McNamaras' property as a "full take."

The McNamaras moved into their new home in September 2004. The draft environmental impact report (draft EIR) for the PIP circulated in May 2005. The McNamaras first learned of the PIP in 2005. Had they known of the PIP, they would not have built their home.

In August 2005, the McNamaras were notified by DOT of a public hearing put on by DOT about the PIP. DOT had not contacted the McNamaras between January 2003 and August 2005. The McNamaras attended the hearing and learned that the PIP involved the area where their home was sited and understood that their "home was in jeopardy." Because the aerial survey used to plan the PIP did not show their home, the

2

McNamaras could not see precisely how the project would affect their home. Michael McNamara contacted DOT and asked them to "'save'" their home. The person he spoke with at DOT told him "they would see what they could do." DOT also told him that it would begin acquiring the necessary properties only after the final environmental impact report (final EIR) was approved. Michael McNamara continued to make contact with DOT about the impact of the PIP on his property.

DOT made an attempt to redesign the PIP to avoid the McNamaras' home. This proposed redesign was "the best [DOT] could do" to avoid the McNamaras' home. The proposed redesign would have blocked access to the front door of the home during several years of construction and placed the right of way 21 feet from the front door. The roadway itself would have been 50 feet from the front door, and the McNamaras' driveway would no longer have been usable. Nevertheless, DOT did not disclose these facts to the McNamaras. Instead, DOT told Michael McNamara that it had "minimized the impacts," though the project would still be "very much in his front yard."

The final EIR for the PIP was approved in March 2006. At that point, the decision to build the PIP had been made. The PIP required DOT to acquire roughly 120 parcels. In March 2006, DOT divided these parcels into groups. The first group that it dealt with were the ones it identified as "full takes" and those parcels where the owners had previously made contact with DOT. In September 2006, DOT acquired the McNamaras' neighbor's property. The neighbor told Michael McNamara that he had been told that the McNamaras' property "'is also history.'" Michael McNamara immediately contacted DOT. DOT informed him that they were acquiring only full takes at this point, and the McNamaras' property was not a full take. Michael McNamara understood this to mean that DOT would be taking only the "base" of his property near the frontage road, which would allow them to remain in their home.

In August 2007, DOT sent the McNamaras a "Notice to Appraise" stating that DOT did not "need all" of their property. When the appraiser came out to do the

3

appraisal, Michael McNamara asked him to "have the property staked" so that he could see what the "part take" would look like. The appraiser was not aware of the precise lines, so he said he would put in a request.

In November 2007, a survey crew came out and staked the "partial take" and the "temporary construction easement." Michael McNamara, who was present when the staking was done, could immediately see that the house would be uninhabitable after the "partial take." He told the surveyors: " 'You guys just bought this house.' " Michael McNamara also called DOT and told them the same thing. He explained that the "partial take" would destroy his septic system. It would also prevent access to the property's well, which was its sole source of water. The well, which provided water to three properties, was in the right of way being acquired by DOT. The construction easement would cut off access to the front door, the garage, and the driveway during the three to four years of construction. The McNamaras immediately started looking for a new home. However they lacked the financial ability to purchase another home until DOT paid them for their property. They never tried to rent or sell their home.

A DOT acquisition agent met with the McNamaras in February 2008 and made an initial offer. The McNamaras found the amount of the initial offer "insulting." The appraiser who had prepared the appraisal upon which the initial offer was based had substantially reduced the value based on his opinion that the home was "functionally obsolete." He had also based his appraisal on an incorrect number of bedrooms. The McNamaras pointed out these errors, but no changes were made. They made an offer on a replacement home that was contingent on DOT's making "an acceptable offer" for their property. The McNamaras remained "in limbo." They moved out of their home in January 2009.

4

## II. Procedural Background

In July 2008, DOT filed its complaint seeking to take the McNamaras' property for the PIP. The McNamaras answered the complaint and alleged that they were entitled to just compensation, litigation expenses, and precondemnation damages. Their claim for precondemnation damages was expressly based on allegations that there had been "unreasonable delay and/or unreasonable conduct" by DOT that had caused them additional damage, and they explicitly cited *Klopping v. City of Whittier* (1972 ) 8 Cal.3d 39 (*Klopping*). DOT obtained possession of the property in February 2009.

In December 2009, DOT filed its list of expert witnesses and valuation data.[1] DOT's expert's valuation of $1,080,000 did not include any amount for precondemnation damages. The McNamaras' expert's valuation provided a fair market value for the property of $1,550,000. He also concluded that the property should have been taken in September 2006, when it would have been worth an additional $400,000. By a different alternative calculation, he estimated the precondemnation damages at $230,000. The McNamaras' final demand was for $1,395,000 excluding interest and costs. DOT's final offer was $1,355,000 including "all costs, all fees, and interest in this matter."

DOT brought a group of motions in limine that sought to preclude the McNamaras from proving up their precondemnation damages claim. DOT argued that the McNamaras could not establish the two elements necessary under *Klopping* to recover precondemnation damages. The court denied these motions. The court tried the issue of whether DOT was liable for precondemnation damages. At the conclusion of the court trial, DOT sought a nonsuit, which the court denied. The court found that DOT was liable for precondemnation damages beginning in September 2006.

---

[1]     On the eve of trial, DOT filed a supplemental expert witness list and supplemental valuation data. The identity of their expert appraiser and the amount of his valuation did not change.

After this ruling, DOT sought a continuance of the jury trial so that it could obtain expert testimony on the precondemnation damages issue. The court denied DOT's motion and precluded DOT from offering evidence challenging the McNamaras' precondemnation damages claim. The McNamaras' expert testified at trial that their precondemnation damages were $400,000.

The jury returned a verdict finding that the fair market value of the property in July 2008 was $1.2 million and that the amount of precondemnation damages was $175,000. The McNamaras moved for JNOV arguing that they were entitled to $400,000 in precondemnation damages because there was no expert testimony that their precondemnation damages were anything other than $400,000. The court granted the motion. It issued a statement of decision and a judgment awarding the McNamaras $1.6 million. The McNamaras filed a motion seeking to recover their litigation expenses under Code of Civil Procedure section 1250.410, subdivision (b). The court granted the McNamaras' motion and awarded them $603,636 in attorney's fees, along with expert witness and appraiser fees and their costs of $30,107.22. DOT timely filed a notice of appeal from the judgment and order.

### III. Analysis

DOT contends that the McNamaras failed to present substantial evidence that its conduct *caused* a diminution in the value of the McNamaras' property. Thus, it argues that the McNamaras were not entitled to recover *any* precondemnation damages.

Liability for precondemnation damages "is an issue for the trial court, not the jury," and we review the trial court's finding for substantial evidence. (*Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 82, fn. 3.) The seminal case on precondemnation damages is *Klopping*, which was an inverse condemnation case. The City had originally sought to condemn the property, but it subsequently decided not to do so. The property owners sought damages for the period during which

6

the property faced condemnation. (*Klopping*, *supra*, 8 Cal.3d at pp. 42-43.) They claimed that the fair market value of their property had "declined as a result of" the "condemnation cloud" created by the City's announcement that it would be condemning the property. (*Klopping*, at pp. 45-46.) They sought to recover for their "loss of rental income" during the period that the property faced condemnation. (*Klopping*, at p. 46.)

The California Supreme Court noted that, "[w]hile in California [the valuation] date is set by statute at the time the summons is issued (Code Civ. Proc., [former] § 1249), depending on the nature of those activities occurring prior to the issuance of summons a different date may be required in order to effectuate the constitutional requirement of just compensation."[2] (*Klopping*, *supra*, 8 Cal.3d at p. 44.) The court distinguished a claim for precondemnation damages from a claim of a "de facto taking." A de facto taking occurs when there is a " 'physical invasion or direct legal restraint' " prior to the statutory valuation date. (*Klopping*, at p. 46.) Where there has been a de facto taking, "all decline in value after that date is chargeable to the condemner. This would include damages wholly unrelated to the precondemnation activity of the public agency" such as "a general decline in market value in the area . . . ." (*Klopping*, at p. 46.) In contrast, where the claim is for precondemnation damages, "any decline in the market value of the properties caused by general conditions unrelated to the activities of the condemner would be shouldered by the landowner." (*Klopping*, at p. 47.)

"[W]hen the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our

---

[2]     After *Klopping*, the Legislature repealed the statute setting the valuation date as the date of issuance of the summons and enacted new statutes. Since 1976, the valuation date has generally been either the date of deposit of probable compensation (Code Civ. Proc., § 1263.110) or the date of commencement of the proceeding (Code Civ. Proc., § 1263.120). In the case before us, it was undisputed that the statutory valuation date was July 2008.

constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property so as to measure the fair market value as of a date earlier than that set statutorily by [former] Code of Civil Procedure section 1249. Under our conclusion here in most instances the valuation date remains fixed at the date of the issuance of the summons. Thus a public authority is not required to compensate a landowner for damages to his property occurring after the announcement if the injury is not unreasonably caused by the condemning agency; interest is likewise to run not from the announcement but from the valuation date." (*Klopping*, *supra*, 8 Cal.3d at pp. 51-52.)

The court concluded that a property owner may be entitled to precondemnation damages if the owner demonstrates that "(1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping*, *supra*, 8 Cal.3d at p. 52.) The court reiterated that "losses occasioned by a general decline in the property value . . . occurring prior to the date of taking must, however, be borne by the property owner." (*Klopping*, at p. 53.)

The McNamaras failed to adduce any evidence that their property's value was damaged "as a result of" DOT's actions rather than by "a general decline in the property value." Since they sought precondemnation damages, not damages for a de facto taking, it was their burden to bear a loss in their property's value due to a declining market prior to the date of the taking. The McNamaras' expert testified: "So the market was declining. [¶] Certainly *Caltrans is not responsible for the market decline*. But Caltrans is responsible, in my opinion, for locking that property in, where the owner could not realize their profit for gain." (Italics added.) While their expert's "opinion" was that DOT was "responsible" for precluding the McNamaras from selling their property in

2006, when the market was at its peak, neither he nor any other witness identified a causal relationship between DOT's conduct and the property's decline in value between September 2006 and July 2008. Surely there was evidence that the property was worth more in 2006 than it was in 2008. Had DOT condemned the property in 2006, the property's fair market value would have been higher. However, because this was not a de facto taking claim, the McNamaras were required to bear the loss in the property's value caused by a general decline in the real estate market.

The analytical error in the McNamaras' theory is that it equates a hypothetical loss suffered by the McNamaras with an actual loss sustained during the precondemnation period. Had DOT condemned the McNamaras' property in 2006, the McNamaras would have received a larger sum for their property's fair market value because the property was worth more in 2006. The McNamaras received a smaller sum as compensation for their property because the property's value had declined by 2008. Yet it was undisputed that the decline in the property's value was caused solely by a market decline, not by DOT, and that DOT's precondemnation conduct itself did not affect the value of the property during the precondemnation period. This is not a case like *Klopping* where the owners were unable to utilize the property during the precondemnation period. The McNamaras continued to live on their property throughout that period, and they presented no evidence that the property's value as a residence was reduced during that period.[3] What it comes down to is that the McNamaras sought damages that may be obtained only for a de facto taking, even though they made no effort to show such a taking had occurred. *Klopping*

---

[3] They did present some evidence that they had experienced vandalism during that period that they attributed to DOT's delay. However, no expert testimony was received quantifying any reduced value of the property as a residence during the precondemnation period as a result of this vandalism, and the trial court's finding of precondemnation damages liability was based solely on the diminution in value of the property due to market decline.

9

does not permit an owner to recover precondemnation damages for general market decline as that is not attributable to the condemner. Since the McNamaras sought precisely that, their precondemnation damages claim could not succeed.[4]

Our conclusion regarding the McNamaras' precondemnation damages claim also necessitates reversal of the court's award of litigation expenses. The McNamaras sought litigation expenses under Code of Civil Procedure section 1250.410, subdivision (b). That provision entitles a defendant in an eminent domain proceeding to recover litigation expenses only if the court finds that "the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding . . . ." (Code Civ. Proc., § 1250.410, subd. (b).)

The trial court's award of litigation expenses was expressly premised on its erroneous belief that DOT was liable for precondemnation damages. Due to that erroneous belief, the court was able to conclude that DOT's final offer was unreasonable in light of the compensation awarded (including precondemnation damages) to the McNamaras. However, in the absence of the erroneous precondemnation damages award, no such finding can be made. DOT's final offer was $1,355,000 including "all costs, all fees, and interest in this matter," while the McNamaras' final demand was for $1,395,000 excluding interest and costs. Since the McNamaras were not entitled to recover any precondemnation damages, the "compensation awarded" to them is limited to the jury award of $1.2 million for the fair market value of their property plus interest and costs. Even accounting for the McNamaras' costs and recoverable interest, it is not possible that DOT's offer was significantly less than the "compensation awarded" to the

---

[4]     Since DOT lacked liability for the damages the McNamaras sought, we need not address DOT's challenge to the court's grant of JNOV on the amount of precondemnation damages. The McNamaras were not entitled to any such damages.

10

McNamaras. Thus, the trial court could not conclude that DOT's offer was "unreasonable . . . in light of . . . the compensation awarded" to the McNamaras. Therefore, it would serve no purpose to remand this matter to the trial court for it to reconsider its award of litigation expenses. The McNamaras simply cannot establish that they are entitled to an award of litigation expenses under Code of Civil Procedure section 1250.410, subdivision (b).

## IV.  Disposition

The judgment is reversed, and the trial court is directed to enter a new judgment rejecting the McNamaras' claim for precondemnation damages. The order awarding the McNamaras their litigation expenses is reversed, and the court is directed to enter a new order denying the McNamaras their litigation expenses. DOT shall recover its appellate costs.

_____
Mihara, J.

WE CONCUR:


_____
Premo, Acting P. J.



_____
Duffy, J.[*]

_____

[*]     Retired Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11

H036228

| | |
|---|---|
| Trial Court: | Monterey County Superior Court |
| Trial Judge: | Honorable Lydia Villarreal |
| Attorneys for Plaintiff and Appellant: | Ronald W. Beals<br>Chief Counsel for the State of California<br>Department of Transportation |
| | David Gossage<br>Deputy Chief Counsel |
| | Lucille Y. Baca<br>Assistant Chief Counsel |
| | Derek S. van Hoften |
| | James Morrison Wyman |
| Attorneys for Defendants and Respondents: | Heidi A. Timken<br>Timken Johnson LLP |
| | Leslie A. Johnson<br>Timken Johnson LLP |
| | Christopher J. Gonzalez<br>Timken Johnson LLP |
| | Abram P. Petersen<br>Timken Johnson LLP |