Filed 7/30/14  Atlas Allied v. San Diego Community College Dist. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ATLAS-ALLIED, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SAN DIEGO COMMUNITY COLLEGE DISTRICT et al., <br><br> Defendants and Respondents. | D061295 <br> D061774 <br><br><br> (Super. Ct. No. 37-2010-0091274- <br> CU-CO-CTL) |

CONSOLIDATED APPEALS from judgments of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Affirmed.

Mahoney & Soll and Paul M. Mahoney for Plaintiff and Appellant.

Stutz, Artiano, Shinoff & Holtz and William C. Pate for Defendant and Respondent San Diego Community College District.

Balistreri Potocki & Holmes, Karen A. Holmes; Koenig Jacobsen, Gary L. Jacobsen and Lisa G. Shemonsky for Defendant and Respondent Nolte Associates, Inc.

Plaintiff Atlas-Allied, Inc. (Atlas) contracted with defendant San Diego Community College District (the District) to construct an underground fire suppression system on the District's Miramar College campus after submitting the lowest bid on the project. Defendant Nolte Associates, Inc. (Nolte), an engineering firm, designed and prepared the plans and specifications for the project. After it completed the project, Atlas sued the District and Nolte for damages it incurred as a result of allegedly unforeseen conditions on the project site that caused it to incur costs that exceeded the contract price. The trial court entered judgment after a court trial in favor of the District on Atlas's causes of action against the District for breach of contract and "Breach of Warranty/Failure to Disclose Hidden Conditions on the Project Plans and Specifications." The court entered a separate judgment in favor of Nolte after granting Nolte's motion for judgment under Code of Civil Procedure section 631.8 on Atlas's causes of action against Nolte for negligence and negligent misrepresentation.

Atlas appeals both judgments.[1] Regarding the judgment in favor of the District, Atlas contends (1) there is no substantial evidence to support the court's finding that the District did not breach the implied warranty of the plans and specifications; (2) the court's

---

[1] In case No. D061774, Atlas filed a notice of appeal from the March 9, 2012 order denying its motions to tax costs claimed by the District and Nolte. This court accepted the parties' stipulation to consolidate the appeals and ordered them consolidated on May 16, 2012. The only argument Atlas makes regarding costs in this appeal is to state that if we reverse the judgment, we should also reverse the award of costs. Because we are not reversing the judgments, we will not further address the award of costs.

2

ruling in favor of the District violates the Public Contract Code;[2] (3) there is no substantial evidence to support the court's finding that Atlas was fully compensated under the contract for its claim of differing site conditions; (4) there is no substantial evidence to support the court's finding that the contract completion date was not delayed or impacted by the differing site conditions; (5) there is no substantial evidence to support the court's finding that Atlas did not rely on misinformation regarding subsoil conditions on the project site; (6) the court committed legal error in finding that Atlas was on notice to further investigate subsoil conditions on the project site; (7) the court erred in rejecting Atlas's expert witness's "measured mile" method of calculating damages for loss of productivity; and (8) the court erred in not awarding Atlas damages for extended home office and field office overhead.  Regarding the judgment in favor of Nolte, Atlas contends (1) there is no substantial evidence to support the judgment, and (2) the court should have granted a new trial on the ground Nolte was acting as the ostensible agent of the District.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In early 2008 Nolte entered into a contract with the District to design improvements to the fire suppression system on the Miramar Community College campus.  The project involved the installation of fire hydrants and approximately 2,700 linear feet of underground water pipeline, with connections to existing pipelines on the

---

[2]     All further statutory references are to the Public Contract Code unless otherwise noted.

campus and pipelines off campus owned by the City of San Diego (the City). Juan Palacios, a civil engineer employed by Nolte, prepared the technical specifications for the project.

In February 2009 the District solicited bids for the project and held a mandatory pre-bid meeting that included a walk through the project site. Melissa Siciliani, the daughter of Atlas's owner, attended the walk-through on behalf of Atlas. She took photographs of the site and made written notes stating that the ground was "hard" and there was no soils report for the project. Nile Sensabaugh, who worked for Atlas as an estimator and project manager, prepared Atlas's bid for the project after reviewing the plans and technical specifications for the project and Siciliani's notes and photographs. Sensabaugh testified that there are no soils reports for about 50 percent of the projects for which he prepares bids and that whether or not there is a soils report, "we go through the same mechanical process to bid the job."

The "Special Conditions" part of the technical specifications included a section entitled "Soil Conditions" (section HH), which included the following language that the District prepared: "Geotechnical investigation for the surrounding improvements describes the underlying soils as sandy clay over highly cemented gravel and cobble conglomerate (Linda Vista Formation). Trenching into the Linda Vista Formation will be difficult and may require heavy equipment." Section HH was a standard condition the District had used in other projects at Miramar College. Sensabaugh testified that he considered this language vague as to the meaning of "heavy equipment." However, Atlas did not ask the District for clarification of that term before bidding and did not request

4

any other additional information from the District or communicate with Nolte before submitting its bid.

Atlas uses an internal excavation formula to calculate the total number of manhours required for a job. The formula involves multiplying a coefficient representing the number of manhours required to excavate one cubic yard of soil times the total amount of cubic yards to be excavated, based on the depth of the excavation. In preparing Atlas's bid for the subject project, Sensabaugh used a manhour coefficient of 0.38, which is Atlas's lowest excavation coefficient used for trenches four feet deep or less. After initially calculating Atlas's bid, Sensabaugh reduced the amount by 25 percent because the project required installation of 2,700 linear feet of pipeline and he based his initial calculation on 3,600 feet. Atlas ultimately submitted a bid in the amount of $316,200 and the District awarded the contract to Atlas as the lowest bidder.

The contract provided that work on the project was to commence on the date stated in the District's notice to proceed and be completed within 160 days from that date. By letter dated May 29, 2009, the District authorized Atlas to commence "this job as of June 1, 2009, which will constitute the beginning date under the time limit provided in the contract." The letter noted the completion date for the work was November 8, 2009, 160 days after June 1st.

The contract required Atlas to submit a baseline progress schedule for the District's approval before it began work on the project. The contract provided that "[t]he schedule shall clearly identify all staffing and other resources which in the Contractor's judgment are needed to complete the project within the time specified for completion.

5

The schedule shall include milestones and shall include the 'critical path' of construction." The baseline schedule is used during the work on a project to measure how a project is progressing in relationship to the schedule.

On June 9, 2009, Atlas submitted a baseline schedule that provided for completion of the project on November 8, 2009. The District approved the schedule on June 15. The schedule showed that the pipeline for the project would be installed in three phases that were identified as the west alignment, east alignment, and north alignment. The schedule identified the completion dates for the three phases as July 31, 2009, for the west alignment, August 28, 2009, for the east alignment, and October 1, 2009, for the north alignment.[3] In this litigation, Atlas claims that notwithstanding the schedules it submitted to the District, it intended to complete the project in 55 days. However, Atlas did not inform the District during the construction that it intended to finish the project ahead of schedule.

Atlas began its work on the project on June 19, 2009, and began trenching on June 22. In a weekly report dated June 26, 2009, the District's inspector, Phillip San Filippo, noted Atlas was behind schedule and informed him "that they need larger equipment to excavate faster and catch up to schedule." While excavating on July 1, 2009, Atlas encountered a rocky condition that lowered its production.

_____

[3]    These completion dates included the days required for "Testing" and "Connections." In their briefs, Atlas and the District identify the completion dates as the earlier dates specified in the schedule for completion of the backfilling—i.e., July 20 for the west alignment, August 21 for the east alignment, and September 24 for the north alignment.

On July 7 Sensabaugh gave the District written notice that Atlas had encountered what it "believ[ed] to be *Differing Site Conditions* concerning the . . . project." Sensabaugh stated in the notice: "At this time we have encountered unknown solid rock while excavating for the installation of fire line north alignment . . . . [¶] While we did expect to hit cobbles & hard ground during the installation process[,] it is assumed by the information provided to us in the contract documents . . . that reasonable excavating equipment should be able to perform this job due to the locations of the fire line in [proximity] to existing buildings & site improvements. [¶] To date we have installed approximately 640' of 8" mainline in 9 working days. During this time we have used 3 pieces of excavation equipment ranging in weight from 15,000 lb to 24,000 lb with multiple buckets[,] including single & multiple ripper buckets. This equipment is not working in the area referenced above. [¶] The next plan we would implement is to bring in a *Breaker Attachment* to our 24,000 Backhoe. We would view this as *extra work* & could perform this on a Time & Material Basis with inspector Phil San Filippo & our Field Superintendent reconciling tickets on a daily basis as needed. [¶] This change may delay completion of the project; however[,] we are not able to determine the length of such delay or extra cost at this time. We reserve the right to claim an appropriate time extension & increase in overhead when they are determined."

That same day, Filippo sent Sensabaugh an e-mail message stating that he had informed Sensabaugh in a phone conversation that the rock material Atlas encountered was stadium conglomerate, which Filippo referred to as "a highly cementious material different [from] the cobble/clay material known as Linda Vista." Filippo informed

7

Sensabaugh that stadium conglomerate "is predominate [through] San Diego and elevations of this material [vary] across the site." Filippo accepted Atlas's use of a breaker on a time and material basis where it encountered stadium conglomerate, with the condition that the time and material charges would be on an hourly basis and approved by him daily.

From July 8 through July 16, 2009, the District approved time and material tickets for the use of a backhoe with a 1,200 pound breaker attachment. From July 20 through August 11, 2009, and from August 21 through August 25, 2009, the District approved tickets for the use of a 40,000 pound excavator with a 4,000 pound breaker attachment. The District also approved tickets for the use of a 26,000 pound excavator with a 1,200 pound breaker from August 17 through 19, 2009.

In early August 2009, while its excavation work on the project was still in progress, Atlas submitted a written request for a change order, designated "Request For Change Order #1," in which it estimated that the additional compensation it intended to claim for past and future extra work due to the differing site conditions would be $197,290.19. The District did not respond to that change order request until after the excavation work was completed. By letter dated October 15, 2009, the District acknowledged receipt of Atlas's "transmittal dated 09/09/09 RCO #1 requesting additional compensation," which apparently included a packet of time and material tickets. The District formally rejected Atlas's request, in large part because it viewed many of the tickets as being for work that was within the scope of the contract and unrelated to differing site conditions.

8

Despite the delays caused by Atlas having to trench through stadium conglomerate, Atlas provided the District a schedule update that showed the excavation, pipe laying, and backfilling for the entire project was complete as of September 30, 2009.[4] On October 5, 2009, Sensabaugh informed the District by e-mail that the City had provided Atlas a "two week estimated window for completion" of the City's work to connect the pipelines Atlas had installed to the City's pipelines and that Atlas would be "pulling off the job . . . as our next function to perform is the tie-ins after the [City's] work is completed." The District responded with a letter requesting that Atlas perform unfinished paving and landscaping work within the scope of the contract that, in the District's view, was not related to the City's tie-in work.

The City performed its tie-in work on November 3, 2009. The District recorded a notice of completion stating that Atlas completed its work under the contract on November 20, 2009. On December 1, 2009, Sensabaugh sent the District a "Final Completion Notice" stating that Atlas had "achieved **Final Completion**" of the project as of that date and requesting that the District make a final progress payment in the amount of $568,668.74. Based on all of the time and material tickets it had approved, the District

---

[4]    The contract between Atlas and the District provided: "All required schedules shall be periodically updated to reflect changes in the status of the job, including weather delays. **At a minimum, the Contractor shall be required to provide and keep [an] updated monthly schedule in order to prevent delay claims.**" (Boldface in original) On July 27, 2009, Atlas submitted an updated schedule showing the project was ahead of schedule and identifying the completion date as November 3, 2009. On October 6, 2009, Atlas submitted a second updated schedule showing that backfilling for all three phases of the project was completed as of September 30 and identifying the completion date for the entire project as November 11.

9

ultimately issued a unilateral change order designated "Change Order No. 0007" (Change Order No. 7), which increased the contract time by seven days and provided additional compensation to Atlas in the amount of $30,277.38 for the differing site conditions, including $3,000.46 for "overhead, profit, supervision, [and] bond fees." As a result of Change Order No. 7 and four other change orders, the contract completion date was extended 11 days to November 19, 2009.

Atlas's operative third amended complaint included two causes of action against the District—one for breach of contract and one entitled "Breach of Warranty/Failure to Disclose Hidden Conditions on the Project Plans and Specifications." Atlas alleged the District breached the subject contract by failing to pay additional costs that Atlas incurred as a result of unforeseen differing site conditions. In the breach of warranty cause of action, Atlas alleged that the contract specifications furnished by the District mislead Atlas into believing "there would be no . . . unforeseen differing site conditions, or changes in the scope of work."

Atlas also alleged a third cause of action for negligent misrepresentation and a fourth cause of action for negligence against Nolte. In the third cause of action Atlas alleged that Nolte "through its plans, misrepresented the condition of the soil beneath the work of improvement[,]" and also provided "an inaccurate plan profile that . . . inaccurately depicts existing utility depths which are much shallower [than] are shown on the plan profile." In the fourth cause of action Atlas alleged that Nolte "negligently and carelessly oversaw, managed, directed and advised [Atlas], and negligently researched, developed, and drafted the plans, specifications, drawings and

10

design documents for the project in several respects, including but not limited to, failing to disclose the subsurface condition of the soil where the project was to be performed." Atlas again alleged that Nolte "inaccurately depicted existing utility depths which were much shallower [than] are shown on the plan profile." Under each of its four causes of action, Atlas sought damages in the amount of $519,957.09 plus statutory interest and penalties.

After a jury had been selected, the parties agreed to waive jury and try the case to the court. At the close of Atlas's case-in-chief, Nolte filed a motion for judgment under Code of Civil Procedure section 631.8. The court granted the motion and entered judgment in favor of Nolte. Regarding Atlas's negligence cause of action, the court found that Nolte did not owe a duty of care to Atlas and, consequently, there was no breach of duty. Regarding the negligent misrepresentation cause of action, the court found that Nolte did not make any misrepresentations.

The trial continued against the District. After the close of evidence, counsel for Atlas and the District each submitted a proposed statement of decision at the court's request. The court adopted and filed the District's proposed statement as its own statement of decision and entered a judgment in favor of the District incorporating the statement of decision. Regarding Atlas's cause of action for breach of contract, the court found the District fully compensated Atlas for its claim of differing site conditions in compliance with the terms of the contract and section 7104, and that the claimed differing site conditions did not delay or impact the contract completion date and Atlas's project schedules. Regarding Atlas's cause of action for breach of the implied warranty of the

11

plans and specifications, the court found that Atlas did not rely on misinformation regarding the subsoil conditions and that the conditions Atlas encountered were not materially different from what the District represented in the special conditions section of the contract. The court also found that the plans, specifications, and other information the District provided put Atlas on notice to investigate further and did not mislead Atlas. Atlas filed this appeal after unsuccessfully moving for a new trial as to both the District and Nolte.

## DISCUSSION

### I. *Sufficiency of the Evidence To Support the Judgment as to Atlas's Cause of Action for Breach of Warranty*

Atlas contends the judgment should be reversed as to its cause of action against the District for breach of implied warranty of the plans and specifications because there is insufficient evidence to support the court's finding that Atlas did not rely on misinformation regarding subsoil conditions on the project site. Atlas also contends the court committed legal error in finding Atlas was on notice to further investigate subsoil conditions on the project site.

Under the well-established standard of review applicable to a claim that a judgment or finding is not supported by the evidence in the record, "we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to

12

whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631, italics omitted.) " 'The substantial evidence [standard of review] applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 958.)

We conclude there is sufficient evidence to support the court's finding that Atlas did not rely on misinformation regarding subsoil conditions on the project site. The gravamen of Atlas's breach of warranty claim is that it is entitled extra compensation for the damages it suffered as a result of the District failure to disclose the existence of stadium conglomerate on the project site. As a general rule, "a contractor that has agreed to a particular performance at a specified price may not avoid its contractual obligations or seek additional compensation for performing them because unanticipated difficulties are encountered." (*Los Angeles Unified School Dist. v. Great American Ins. Co.* (2010) 49 Cal.4th 739, 747-748 (*Los Angeles Unified*).) However, under certain circumstances,

13

" '[a] contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented.' " (*Id.* at p. 748.) "The crucial question is . . . one of justified reliance. If the agency makes a 'positive and material representation as to a condition presumably within the knowledge of the government, and upon which . . . the [contractor] had a right to rely,' the agency is deemed to have warranted such facts . . . . [Citation.] But if statements 'honestly made' may be considered as 'suggestive only,' expenses caused by unforeseen conditions will be placed on the contractor . . . ." (*Wunderlich v. State of California* (1967) 65 Cal.2d 777, 783 (*Wunderlich*); *Los Angeles Unified, supra,* 49 Cal.4th at p. 755 (dis. opn. of Corrigan, J.) [noting the *Wunderlich* court held that a contractor cannot rely on a public entity's honest statements relating to the property's condition that are suggestive only].)

In *Los Angeles Unified* the California Supreme Court clarified the circumstances under which a contractor can recover damages from a public entity for failure to disclose facts that would affect the contractor's bid or performance. The Supreme Court held that "a contractor on a public works contract may be entitled to relief for a public entity's nondisclosure in the following limited circumstances:  (1) the contractor submitted its bid or undertook to perform without material information that affected performance costs; (2) the public entity was in possession of the information and was aware the contractor had no knowledge of, nor any reason to obtain, such information; (3) any contract

14

specifications or other information furnished by the public entity to the contractor misled the contractor or did not put it on notice to inquire; and (4) the public entity failed to provide the relevant information. The circumstances affecting recovery may include, but are not limited to, positive warranties or disclaimers made by either party, the information provided by the plans and specifications and related documents, the difficulty of detecting the condition in question, any time constraints the public entity imposed on proposed bidders, and any unwarranted assumptions made by the contractor. The public entity may not be held liable for failing to disclose information a reasonable contractor in like circumstances would or should have discovered on its own, but may be found liable when the totality of the circumstances is such that the public entity knows, or has reason to know, a responsible contractor acting diligently would be unlikely to discover the condition that materially increased the cost of performance." (*Los Angeles Unified, supra,* 49 Cal.4th at pp. 753-754.) The trial court in the present case found that Atlas did not satisfy the "elements established in [*Los Angeles Unified*]."

The evidence supports the court's finding that the first circumstance or "element" articulated in *Los Angeles Unified* is not satisfied—i.e., that Atlas did not submit its bid or undertake performance without material information that affected its performance costs. Section HH informed Atlas that geotechnical investigation for improvements surrounding the project cite had described "the underlying soils as sandy clay over highly cemented gravel and cobble conglomerate (Linda Vista Formation). Trenching into the Linda Vista Formation will be difficult and may require heavy equipment." The court could reasonably view section HH as providing material information about the subsurface

15

conditions even though it did not specifically refer to stadium conglomerate. As the court noted in its statement of decision, the District's geotechnical expert Mark Cuthbert testified that the Linda Vista Formation is the same geological formation and material as stadium conglomerate. Cuthbert testified that he did not believe the material Atlas encountered on the site was an "unforeseen differing site condition." He stated that "[t]he difference between [the Linda Vista Formation and stadium conglomerate] is predominantly their age. They are made of essentially the same materials. The degree of cementation is almost the same. The . . . challenge in working in them is certainly the same."[5] Cuthbert further testified that section HH's warning that trenching into the Linda Vista Formation might be difficult and require heavy equipment meant that "there's going to have to be some extraordinary effort made to excavate into this material. And this was the specification's way of trying to bring that to the attention of those who are going to do the work." Cuthbert's testimony supports the court's finding that Atlas was not misled by

---

[5]    Cuthbert elaborated that "the materials that the [Linda Vista Formation] was created from were derived from the Stadium Conglomerate. So we've got virtually the same type of rock. We've got much of the same matrix in between those . . . —cobbles and that gravel and varying degrees of cementation. There are some places where it's much more loose. And then at the very, very surface of the [Linda Vista Formation], it tends to by more [claylike] material because it's weathered." He also testified that the material Atlas encountered did not qualify as "rock," which the contract defined as "any material which cannot be excavated with a track mounted 235 Caterpillar backhoe with a narrow bucket, and teeth, and requires the use of special buckets, rock teeth, jack-hammering, blasting and/or other special methods of excavation." Noting that Atlas used a 20,000 pound rubber-tire backhoe and a 40,000 pound track hoe with a breaker bar, Cuthbert testified that a 235 Caterpillar backhoe weighs 80,000 pounds, and that "no piece of equipment, to my knowledge, was ever utilized on this site for the excavations that even came to barely half that."

section HH because the information in section HH was true. As the court noted, "[Atlas] did not bid this job on information it accepted as true, which later turned out to be false. Special Condition [Section] HH is not false." Section HH is properly characterized as an "honestly made" and "suggestive only" representation about the soils conditions. Accordingly, the court properly placed the expenses caused by the unforeseen condition of the stadium conglomerate on Atlas. (*Wunderlich, supra,* 65 Cal.2d at p. 783.)

The court also reasonably found that second and third circumstances articulated in *Los Angeles Unified* were not present—i.e., the evidence did not show that the District was in possession of material information and was aware that Atlas had no knowledge of, nor any reason to obtain, the information, and that contract specifications or other information that the District furnished misled Atlas or did not put it on notice to inquire. Although there was evidence that the District was aware of the presence of stadium conglomerate from geotechnical investigations for other projects on the campus, there is no evidence that the District was aware that Atlas would encounter stadium conglomerate in the specific areas where it was required to trench. When Atlas first reported that it was having difficulty trenching through the stadium conglomerate, the District's inspector, San Filippo, informed Sensabaugh that elevations of stadium conglomerate varied across the site. A geotechnical report prepared for an earlier project on the campus noted that although geologic maps show that the Linda Vista Formation is underlain by stadium conglomerate, the test borings performed for the project did not encounter any stadium conglomerate. Thus, the evidence did not establish that the District was in possession of information that Atlas was certain to encounter stadium conglomerate in performing the

17

excavation for the project. As the trial court noted in its statement of decision, "In section HH, the District made no quantitative representation, such as boring logs or blow counts, of either the hardness of the soil or the level of difficulty of excavation that would be encountered constructing the Project."

In any event, the evidence does not show the District was aware that Atlas had no knowledge or any reason to obtain information about the subsoil conditions on the site. Rather, the evidence sufficiently supports the court's findings that the District did not mislead Atlas (because section HH is true) and that section HH "and other information provided by the District put [Atlas] on notice to investigate further." Melissa Siciliani attended a pre-bid walk-through of the site on behalf of Atlas and took photographs of the site and noted that the ground was hard and there was no soils report for the project. Regarding the statement in section HH indicating its description of the underlying soils was based on "geotechnical investigation for the surrounding improvements," Cuthbert testified that the statement "indicates . . . there are other geotechnical investigations that were provided for the structures in the . . . Miramar area . . . that they drew from to create this representation of the geotechnical conditions." For example, a 2006 geotechnical report for a project to construct a new library showed that stadium conglomerate was "the underlying geologic unit at the bottom of all ten exploratory test pits excavated at the Site." The report stated: "The Stadium Conglomerate constitutes bedrock at the site. . . . [R]ocks of the Stadium Conglomerate Formation underlay not only the Site but the general vicinity. In general, the Stadium Conglomerate is characterized for its massive nature and scarcity of bedding." The court reasonably found that Atlas "had every reason

18

to obtain this information since [Atlas] was based outside San Diego County and had never worked at Miramar College."

Even assuming section HH was misleading because it did not expressly reference stadium conglomerate, we conclude the court properly rejected Atlas's breach of warranty claim because substantial evidence supports its finding that Atlas did not rely on section HH in preparing its bid. Sensabaugh testified that he had read section HH and was aware there was no soils report for the project. He further testified that there are no soils reports for about 50 percent of the projects for which he prepares bids, and that whether or not there is a soils report, "we go through the same mechanical process to bid the job." Despite section HH's warning that the excavation work for the project would be difficult and might require heavy equipment, Atlas prepared its bid based on its lowest manhour coefficient for excavation work. Further, the court noted that Atlas "did not include any heavy equipment in its base bid as the line item for 'excavators' was left blank." The court also noted that "[a]t the pre-bid meeting, [Atlas] was provided the phone number and names of the Construction Manager and District Architect, yet never made any inquiries related to soil conditions and did not submit any questions whatsoever before submitting its bid." This evidence sufficiently supports the court's finding that Atlas "did not rely on section HH or information provided at the pre-bid walk through when it bid [on the project]."

Further, the Supreme Court in *Los Angeles Unified* clarified that although "section 1104 prohibits public entities from requiring bidders to assume responsibility for the

19

completeness and accuracy of architectural or engineering plans and specifications,[6] public entities retain the power to contractually disclaim responsibility for assumptions a contractor might draw from the presence or absence of information.  As [the *Wunderlich* court explained]:  'It is obvious that a governmental agency should not be put in the position of encouraging careless bidding by contractors who might anticipate that should conditions differ from optimistic expectations reflected in the bidding, the government will bear the costs of the bidder's error. . . .  When there is no misrepresentation of factual matters within the state's knowledge or withholding of material information, and when both parties have equal access to information as to the nature of the tests which resulted in the state's findings, the contractor may not claim in the face of a pertinent disclaimer that the presentation of the information, or a reasonable summary thereof, amounts to a warranty of the conditions that will actually be found.' "  (*Los Angeles Unified, supra,* at p. 752, quoting *Wunderlich, supra*, 65 Cal.2d at pp. 786–787.)

Here, the District did not misrepresent factual matters through section HH or otherwise, or withhold material information, and Atlas was not denied access to information about the presence of stadium conglomerate in the project area before

---

6    Section 1104 provides:  "No local public entity, charter city, or charter county shall require a bidder to assume responsibility for the completeness and accuracy of architectural or engineering plans and specifications on public works projects, except on clearly designated design build projects.  Nothing in this section shall be construed to prohibit a local public entity, charter city, or charter county from requiring a bidder to review architectural or engineering plans and specifications prior to submission of a bid, and report any errors and omissions noted by the contractor to the architect or owner. The review by the contractor shall be confined to the contractor's capacity as a contractor, and not as a licensed design professional."

submitting its bid.  Consequently, the District's relevant disclaimers in the contract are circumstances that weigh against Atlas's recovery for unforeseen circumstances.  (*Los Angeles Unified, supra,* 49 Cal.4th at p. 754 [The circumstances affecting a contractor's right to recovery for unforeseen conditions may include disclaimers made by either party.].)

The "Information For Bidders" section of the contract includes the statement that "[e]ach bidder shall visit the site of the proposed work and fully acquaint himself with the conditions relating to the construction and labor so that he may fully understand the facilities, difficulties, and restrictions attending to the execution of the work under the contract. . . .  The failure or omission of any bidder . . . to visit the site and acquaint himself with conditions there existing shall in no way relieve any bidder from obligations with respect to his bid or the contract."

Article 60 entitled "SOILS INVESTIGATION REPORT" provides that when there is a soils report, "[a]ny information obtained from such report or any information given on drawings as to subsurface soil condition or to elevations of existing grades or elevations of underlying rock is approximate only, is not guaranteed, and does not form a part of the contract.  Contractor is required to make a visual examination of [the] site and must make whatever tests he deems appropriate to determine the underground condition of the soil."  Article 60 further states that "no representation is made by District or Architect that information provided is solely adequate for purposes of construction.  District disclaims responsibility for interpretations by Contractor of soil and subsurface

21

investigation information, such as in protecting soil-bearing values, rock profiles, presence and scope of boulders and cobbles . . . ."

Section K of the contract's special conditions provides, in relevant part:  "Before submitting a proposal, each bidder will be held to have examined the premises and satisfied himself as to the existing conditions under which he will be obliged to operate, or that will in any way affect work under this contract.  No allowance shall be made subsequently in this connection on behalf of Contractor for any error or negligence on this part."

Under *Los Angeles Unified*, Atlas may not claim in the face of these disclaimers that the information the District provided in section HH and pre-bid communications amounted to a warranty of the conditions Atlas would actually encounter.  (*Los Angeles Unified, supra,* 49 Cal.4th at p. 752.)  The disclaimers in the subject contract further support the trial court's decision that the District is not liable for breach of implied warranty of the plans and specifications.

II.  *Sufficiency of the Evidence To Support the Judgment as to Atlas's Cause of Action for Breach of Contract*

Atlas contends the judgment should be reversed as to its cause of action against the District for breach of contract because there is insufficient evidence to support the findings in the court's statement of decision that Atlas was fully compensated under the contract for its claim of differing site conditions and that the contract completion date was not delayed or impacted by the differing site conditions.

22

*Compensation for differing site conditions*

Although the District did not breach the implied warranty of plans and specifications in failing to disclose the existence of stadium conglomerate in the project area, it accepted Atlas's claim that the stadium conglomerate constituted a differing site condition that entitled Atlas to additional compensation. The issue Atlas raises in this appeal is whether substantial evidence supports the court's finding that the additional compensation that the District paid on a time and material basis satisfied the District's obligations under the contract. We conclude there was sufficient evidence to support that finding.

As noted in our statement of facts, when Atlas encountered the stadium conglomerate, it advised the District that it intended to use a breaker attachment with its 24,000 pound backhoe and would view doing so as extra work that it could perform on a time and material basis. The District agreed to compensate Atlas for the extra work on a time and material basis and at various times approved time and material tickets for use of a backhoe with a 1,200 pound the breaker attachment, a 40,000 pound excavator with a 4,000 pound breaker attachment, and a 26,000 pound excavator with a 1,200 pound breaker attachment. Based on all of the approved time and material tickets, the District unilaterally issued Change Order No. 7, which increased the contract time by seven days and provided additional compensation to Atlas in the amount of $30,277.38 for the differing site conditions, including $3,000.46 for "overhead, profit, supervision, [and] bond fees." The trial court found the District fully compensated Atlas for its claim of differing site conditions in compliance with the terms of the contract, ruling that "Change

23

Order No. 7 was issued in accordance with the contract and was consistent with [section 7104, subdivision (b)]." Atlas essentially argues this ruling is erroneous because Atlas never agreed to the amount the District paid it as additional compensation.

The District's additional compensation complied with article 40 of the contract, which addresses compensation for extra work performed by the contractor as a result of unforeseen conditions. Article 40 provides that when the contractor notifies the District of unforeseen conditions, the "[v]alue of any such extra work . . . shall be determined at the discretion of [the] District in one or more of the following ways: [¶] 1. By acceptable lump sum proposal from Contractor with itemization as required by the District. [¶] 2. By unit prices contained in Contractor's original bid and incorporated in contract documents or fixed by subsequent agreement between District and Contractor. [¶] 3. By the cost of material and labor and a percentage for overhead and profit."[7] The District, with Atlas's agreement, used the third method of compensating Atlas for extra work—i.e., it compensated Atlas on a time and materials basis with a percentage for overhead and profit. The fact that it did so through a unilateral change order because Atlas disputed its determination of the value of the extra work does not constitute a breach of contract. The

---

[7] Section g of article 40 provided: "In the event a mutual agreement cannot be reached on the cost of a change order, Contractor and District agree that an industry estimating guide, such as an estimating guide published by Means, shall be used to determine the cost of a disputed change order item." This provision is not at issue because Atlas does not dispute the cost of any particular item for which the District provided compensation; it disputes the District's refusal to provide compensation for certain other items, such as loss of production, extra housing for crews, and certain extra equipment and labor costs. Atlas has not claimed that the District failed to comply with section g.

evidence sufficiently supports the trial court's finding that the District "fully complied with the terms of the Contract . . . relative to payment for differing site conditions."

In addition to arguing that the court erred in finding the District fully compensated it under the contract for its claim of differing site conditions, Atlas contends the court violated sections 7102, 7104 and 7105, subdivision (d)(2) by letting the District unilaterally determine the amount of its damages. Section 7104 provides, in relevant part: "Any public works contract of a local public entity which involves digging trenches or other excavations that extend deeper than four feet below the surface shall contain a clause which provides the following: [¶] (a) That the contractor shall promptly, and before the following conditions are disturbed, notify the local public entity, in writing, of any: [¶] . . . [¶] (2) Subsurface or latent physical conditions at the site differing from those indicated by information about the site made available to bidders prior to the deadline for submitting bids. [¶] (3) Unknown physical conditions at the site of any unusual nature, different materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract. [¶] (b) That the local public entity shall promptly investigate the conditions, and if it finds that the conditions do materially so differ . . . and cause a decrease or increase in the contractor's cost of, or the time required for, performance of any part of the work shall issue a change order under the procedures described in the contract. [¶] (c) That, in the event that a dispute arises between the local public entity and the contractor whether the conditions materially differ, or involve hazardous waste, or cause a decrease or increase in the contractor's cost of, or time required for, performance of any part of the work, the

25

contractor shall not be excused from any scheduled completion date provided for by the contract, but shall proceed with all work to be performed under the contract. The contractor shall retain any and all rights provided either by contract or by law which pertain to the resolution of disputes and protests between the contracting parties."

Article 68 of the District's contract with Atlas complied with section 7104 by setting forth all of the language required by that statute. Atlas's disagreement with the amount the District paid for extra work through its unilateral change order does not establish a violation of section 7104. Although, as we discussed, the District is not liable in contract for failing to specifically inform Atlas about stadium conglomerate, the District nevertheless acknowledged that the stadium conglomerate required extra work and issued a change order providing compensation for the extra work in accordance with article 40 of the contract and section 7104. Nothing in section 7104 required the District to compensate Atlas for differing site conditions in the full amount Atlas demanded. The statute simply provides that in the event of a dispute, the contractor retains any and all rights provided either by contract or by law pertaining to the resolution of such disputes – i.e., the contractor has the right to pursue any legal remedies to which it may be entitled by, among other things, pursuing litigation, as Atlas did in this case. The District did not violate section 7104 by unilaterally determining the amount of extra compensation based on the time and material tickets it approved.

Atlas's argument that the court violated section 7102 by ruling that the District fully compensated Atlas for unforeseen site conditions is unclear. Section 7102 provides: "Contract provisions in construction contracts of public agencies and subcontracts

26

thereunder which limit the contractee's liability to an extension of time for delay for which the contractee is responsible and which delay is unreasonable under the circumstances involved, and not within the contemplation of the parties, shall not be construed to preclude the recovery of damages by the contractor or subcontractor.  [¶] No public agency may require the waiver, alteration, or limitation of the applicability of this section.  Any such waiver, alteration, or limitation is void.  This section shall not be construed to void any provision in a construction contract which requires notice of delays, provides for arbitration or other procedure for settlement, or provides for liquidated damages."

Atlas cites *Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38 for the proposition that section 7102 permits a contractor to recover delay damages from a public agency even if the parties' contract contains a "no damage for delay" provision.  (*Howard,* at p. 49.)  The contract between the District and Atlas includes a no-damage-for-delay provision that comports with section 7102.[8]  The contract also includes a provision regarding early completion that is not within the scope of section 7102.  Article 6(a) of the contract provides, in relevant part:  "The District is under no obligation to consider early completion of the project and the contract completion date shall not be amended by the District's acceptance of the Contractor's

---

[8]     Article 6(d) of the contract provides:  "District's liability to Contractor for delays for which District is responsible shall be limited to an extension of time for delays unless such delays were unreasonable under the circumstances involved and were not within the contemplation of the parties when the contract was awarded."

proposed earlier completion date.  Furthermore, Contractor shall not, under any circumstances receive any additional compensation from the District for indirect, general, administrative or other forms of overhead costs for the period between the time of earlier completion proposed by the Contractor and the official contract completion date. . . . Regardless of the time lines in the schedule submitted by Contractor, *no delay claims shall be accepted by the District unless the event or occurrence delays the completion of the Project beyond the contractual completion date.*"[9]  (Italics added.)  This provision does not limit the District's liability for delay to an extension of time to complete the contract in contravention of section 7102; it limits the District's liability for delay to events or occurrences that delayed the completion of the project beyond the contract completion date.  Although the court noted article 6(a) in a footnote in its statement of decision, it did not expressly base any part of its ruling on that provision.  However, to the extent the court's ruling was based on article 6(a), it did not violate section 7102.

Atlas's contention that the court's decision violated section 7105, subdivision (d)(2) is also unclear.  Section 7105, subdivision (d)(2) provides, in part:  "Contracts of public agencies, excluding the state, required to be let or awarded on the basis of competitive bids pursuant to any statute may be terminated, amended, or modified only if the termination, amendment, or modification is so provided in the contract or is authorized under provision of law other than this subdivision.  The compensation

[9]    The last sentence of this clause is repeated in a later section concerning time extensions.  Atlas does not cite this limitation on delay claims in arguing that the court's decision violated section 7102.

28

payable, if any, for amendments and modifications shall be determined as provided in the contract. The compensation payable, if any, in the event the contract is so terminated shall be determined as provided in the contract or applicable statutory provision providing for the termination."

As with sections 7104 and 7102, the extent of Atlas's argument that the court's decision violated section 7105, subdivision (d)(2) is to quote the statute and assert that the court violated it "by letting the District unilaterally determine the amount of [Atlas's] damages." How Atlas views that aspect of the court's decision as violating section 7105 is unclear. It may be that Atlas views the District's unilateral determination of Atlas's compensation for differing site conditions as violating the requirement that compensation for contract amendments and modifications be determined as provided in the contract. (§ 7105, subd. (d)(2).) However, as we discussed, *ante*, the District's compensation for differing site conditions complied with the contract notwithstanding the fact that Atlas disputed the amount. The court's decision did not violate section 7105, subdivision (d)(2).

*Contract completion date*

The evidence sufficiently supports the court's finding that the contract completion date was not delayed or impacted by the differing site conditions. As we noted in our statement of facts, the contract originally provided that the work was to be completed within 160 days with the initial completion date being November 8, 2009. The initial baseline schedule that Atlas submitted to the District, as required by the contract, specified the completion date as November 8, 2009, and the completion date of the final

29

pipeline alignment as October 1, 2009. On July 27, 2009, Atlas submitted an updated schedule that showed the project was ahead of schedule and identified the completion date as November 3, 2009. On October 6, 2009, Atlas submitted a second updated schedule showing that backfilling for all three phases of the project was completed as of September 30 and that the entire project would be completed on November 11. Although Atlas claims that it intended to complete the project in 55 days, it never informed the District of that intent during its work on the project.

Various change orders, including Change Order No. 7, extended the contract completion date to November 19, 2009, and the District recorded a notice of completion identifying the completion date as November 20, 2009. Thus, the project was completed within one day of the contract completion date. Although Atlas's encountering stadium conglomerate may have required it take more time to complete the project than it initially anticipated, the delay it caused was not actionable. As we discussed, *ante*, the contract included a provision limiting the District's liability for delay to events or occurrences that delayed the completion of the project beyond the contract completion date and which provision did not violate section 7102.

Atlas contends the trial court's finding Atlas was not delayed on the project is contrary to the holding in *Maurice L. Bein v. Housing Authority of the City of Los Angeles* (1958) 157 Cal.App.2d 670 (*Bein*). In *Bein,* a contract between a public entity (Housing Authority) and contractor provided that the contractor could complete the project in 390 days, but the court found that the contractor could have completed the project in 276 days but for delays caused by the Housing Authority. (*Id.* at p. 677.)

30

Accordingly, the trial court awarded the contractor damages for a delay of 378 days past the 276th day on which the contractor could have completed the project. The Housing Authority argued that those damages were excessive and should have been calculated based on 390 days (the time the contract allowed for performance) rather than 276 days. (*Id.* at pp. 688-689.) The Court of Appeal rejected that argument, reasoning that "[t]he 390 days fixed in the contract was not an estimate of the time in which [the contractor] would actually complete the project; it simply required completion within no more than 390 days." (*Id.* at p. 689.)

*Bein* is distinguishable from the present case. In *Bein* the contractor prepared, and the Housing Authority approved, a progress schedule showing the contractor intended to complete the work in 257 days, and the trial court found the progress schedule "was a reasonable and accurate schedule of the time required for the completion of the work shown therein, and that [the contractor] would have substantially complied with it had it not been for the delay . . . ." (*Bein, supra,* 157 Cal.App.2d at p. 677.) In the present case, Atlas's progress schedules did not reveal its intent to complete the excavation work in 55 days, and there was no finding by the trial court that its undisclosed completion time was reasonable.

Because Atlas and the District contractually agreed that the project would be completed in 160 days, the District cannot be held liable for breach of the contract based on Atlas's inability to complete the project in 55 days. In *United States v. Blair* (1944) 321 U.S. 730, a general contractor similarly sought to hold the United States government liable for delay in performing a contract to construct a federal building. The contract

31

allowed the contractor 420 days to complete the project, but the contractor planned to complete the work in 314 days. The contractor was able to complete the project within the 420 days provided by the contract, but was unable to complete the work in 314 days because of a subcontractor's delay in performing plumbing, heating, and electrical work. (*Id.* at pp. 731-732.) The trial court awarded the contractor damages based on its finding that the government unreasonably delayed the general contractor for three and one-half months by not promptly terminating the subcontractor's right to proceed. (*Id.* at pp. 732-733.) The Supreme Court reversed the award of delay damages on the ground the government was not contractually obligated to aid the contractor in completing his contract before the agreed completion date. (*Id.* at p. 733.) Regarding the contractor's *undisclosed* intent to complete the project in 314 days, the Supreme Court stated: "Nor is there anything in the context of the contract to lead us to believe that the parties meant more than they said, or that the contract implies something that was not expressed. The Government and [general contractor] covenanted that the construction work would be completed within 420 days; [the subcontractor's] contract was grounded on this same time estimate. They cannot be said to have executed these contracts in contemplation of the then unrevealed intention of respondent to complete his work three and one-half months early. The fact that [the general contractor] subsequently gave notice of this intention to all the other parties concerned could not give rise to a new obligation on the Government to compel accelerated performance from [the subcontractor]. [¶] [The general contractor] had the undoubted right to finish his construction work in less time than the stipulated 420 days, but he could not be forced to do so under the terms of the

32

contract. To hold that he can exact damages from the Government for failing to cooperate fully in changing the contract by shortening the time provisions would be to imply a grossly unequal obligation. We cannot sanction such liability without more explicit language in the contract." (*Id.* at pp. 733-734.)

The same principle applies here. The District did not enter into the subject contract in contemplation of Atlas's undisclosed intent to complete the project in 55 days. Atlas had the right to finish the contract in less time than the agreed 160 days, but the District could not force Atlas to finish early. Conversely, the District cannot be held liable for Atlas's failure to meet an undisclosed early completion date to which the District did not agree. The court correctly ruled that "[t]he District did not breach the contract . . . on the basis of an owner caused delay."

Because we have concluded that the District has no liability to Atlas, we need not address Atlas's contentions concerning the proper method of calculating damages. (See *People ex rel. Department of Transportation v. McNamara* (2013) 218 Cal.App.4th 1200, 1209, fn. 4 [having determined governmental entity was not liable for precondemnation damages awarded by the trial court in an eminent domain case, it was unnecessary for the appellate court to address governmental entity's challenge to the amount of such damages]; *Newhart v. Pierce* (1967) 254 Cal.App.2d 783, 792 [having concluded plaintiffs were not entitled to any damages for defendants' breach of contract, it was unnecessary for appellate court to consider whether the trial court erred in failing to award interest from date of breach].)

33

III. *Sufficiency of the Evidence To Support the Judgment in Favor of Nolte*

Atlas contends that the evidence does not support the trial court's entry of judgment in favor of Nolte under Code of Civil Procedure section 631.8. The court's minute order granting Nolte's motion for judgment under that statute states: "The Court finds that Nolte had no part in drafting section HH, and finds that [Atlas] has failed to meet [its] burden of proof on negligence and negligent misrepresentation due to lack of foreseeability and duty. The Court bases [its] finding [of] fact on the credibility of witness testimony, particularly of witness Julian Palacios[,] whose testimony was found to be very credible. The Court finds that both causes of action have not been proven, and orders that a directed verdict as to defendant Nolte be entered."[10] Atlas argues there is substantial evidence in the record to establish that Nolte is liable for negligence and negligent misrepresentation even though Nolte did not prepare section HH.

"The purpose of a motion for judgment is to allow the trial court to dispense with the need for a defendant to produce evidence when, after weighing the evidence at the close of the plaintiff's case, it is persuaded that the plaintiff has failed to sustain its burden of proof. [Citation.] In weighing the evidence on a motion for judgment at the close of the plaintiff's case, the trial court may exercise its prerogatives as a fact finder by refusing to believe witnesses and by drawing conclusions at odds with expert opinion. [Citations.]

---

10    We view the court's reference to a "directed verdict," which does not apply in a court trial, as inadvertent error. The minute order earlier notes the court was ruling on a "motion for judgment," and the judgment in favor of Nolte states that the court granted Nolte's "Motion for Judgment pursuant to California Code of Civil Procedure [s]ection 631.8 . . . ."

34

"In reviewing a judgment granted in favor of defendant after the plaintiff has completed its presentation of evidence in a court trial, the evidence is viewed most favorably to the defendant and the judgment must be supported by substantial evidence. [Citation.] The function of the reviewing court is to determine whether the judgment is supported by any competent and substantial evidence. [Citations.] The trial court's findings in granting a motion for judgment are entitled to the same respect on appeal as any other findings and are not reversible if supported by substantial evidence. [Citation.] When two or more inferences can be reasonably deduced from the evidence, the reviewing court is without power to substitute its deduction for [that] of the trial court." (*Kirk Corp. v. First American Title Co.* (1990) 220 Cal.App.3d 785, 806.)

*Cause of action for negligence*

As noted, the court entered judgment on Atlas's cause of action for negligence against Nolte based on its determination that Nolte did not owe a duty of care to Atlas and, consequently, there was no breach of duty. We review the trial court's determination on the existence of a duty de novo as a question of law. (*Mendoza v. City of Los Angeles* (1998) 66 Cal.App.4th 1333, 1339.) The court stated during oral argument on the motion that its finding of no duty was based on *Weseloh Family Ltd. Partnership v. K.L. Wessel Const. Co., Inc.* (2004) 125 Cal.App.4th 152 (*Weseloh*).

In *Weseloh* a property owner and related entities contracted with a general contractor to construct automobile dealership facilities on the owner's property. After a portion of the retaining walls constructed for the dealership failed, the property owner and general contractor (plaintiffs) brought a negligence action against the design

35

engineers (defendants) who designed the retaining walls. (*Weseloh, supra,* 125 Cal.App.4th. at p. 158.) The defendants contracted to do the design work with the subcontractor that built the retaining walls; they did not contract with the property owner or general contractor and did not have a role in the actual construction of the walls. (*Id.* at pp. 159-160.) The trial court granted the defendants' motion for summary judgment on the ground they did not owe a duty to the plaintiffs as a matter of law. (*Id.* at p. 161.)

The *Weseloh* court affirmed the judgment. (*Weseloh, supra,* 125 Cal.App.4th. at p. 176.) The court noted that whether a defendant owes a plaintiff a duty of care is a question of law to be resolved by the court and is the threshold element and essential prerequisite of a negligence cause of action. (*Id.* at p. 163.) The *Weseloh* court further noted that the California Supreme Court in *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397-398 (*Bily*), citing *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 (*Biakanja*) " 'employed a checklist of factors to consider in assessing legal duty *in the absence of privity of contract between a plaintiff and a defendant. . . .* "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to [plaintiff], [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." ' " (*Weseloh, supra,* 125 Cal.App.4th at pp. 164-165, italics added.)

The *Weseloh* court also noted that in *Bily*, the Supreme Court held that financial auditors generally do not owe a duty of care to third persons in preparing an independent audit of a client's financial statements. (*Weseloh, supra,* 125 Cal.App.4th at p. 165.) The *Bily* court based that holding on the *Biakanja* factors and three additional " 'central concerns':  (1) an auditor exposed to negligence claims from all foreseeable third parties would face potential liability far out of proportion to its fault; (2) 'the generally more sophisticated class of plaintiffs in auditor liability cases . . . permits the effective use of contract rather than tort liability to control and adjust the relevant risks through "private ordering" '; and (3) 'the asserted advantages of more accurate auditing and more efficient loss spreading relied upon by those who advocate a pure foreseeability approach are unlikely to occur.' " (*Weseloh, supra,* 125 Cal.App.4th at p. 166, citing *Bily, supra,* 3 Cal.4th at p. 398.)  The *Weseloh* referred to the three concerns stated in *Bily* as the "*Bily* factors." (*Weseloh, supra,* 125 Cal.App.4th at p. 166.)[11]

Applying the *Biakanja* factors, the *Weseloh* court concluded that "while it was foreseeable that design defects could cause a retaining wall to fail, the [plaintiffs] failed to produce any evidence showing (1) [defendants'] design was primarily intended to affect the [plaintiffs]; (2) the closeness of the [plaintiffs'] injury to [defendants'] conduct;

---

[11]    In *Adelman v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 352, 364, the Court of Appeal referred to the *Bily* factors as "three policy concerns that had to be considered before a duty could be found under the *Biakanja* factors:  (1) liability may in particular cases be out of proportion to fault, (2) parties should be encouraged to rely on their own ability to protect themselves through their own prudence, diligence and contracting power, and (3) the potential adverse impact on the class of defendants upon whom the duty is imposed."

37

(3) any moral blame implicated by [defendants'] conduct; or (4) how, by imposing expanded liability on design engineers under similar circumstances, future harm would be prevented."  (*Weseloh, supra,* 125 Cal.App.4th at pp. 172-173.)

Applying the *Bily* factors, the *Weseloh* court concluded that imposing a duty of care on the defendants "would result in liability out of proportion to fault.  With regard to private ordering, the [plaintiffs] could have required subcontractors to name them as intended beneficiaries of their subcontracts.  The [property owner and dealership] plaintiffs could also have required subcontractors to name them as additional insureds in their insurance policies.  Neither of these contract alternatives was accomplished here." (*Weseloh, supra,* 125 Cal.App.4th at p. 173.)  Thus, the *Weseloh* court concluded that the defendants did not owe the plaintiffs a duty of care.

Because there was no privity of contract between Atlas and Nolte, the trial court properly considered *Weseloh* and its application of the *Biakanja* and *Bily* factors.[12]  We conclude the court correctly decided that Nolte did not owe Atlas a duty of care.

The first *Biakanja* factor is the extent to which Nolte's design work was intended to affect Atlas.  Although the contract between the District and Nolte for the design of the

---

[12]    In ruling on Nolte's motion for judgment, the trial stated:  "I have . . . read and have before me the [*Weseloh* opinion], which I think is instructive on not only both the elements of negligence of a designing professional as it relates to negligence but also to negligent misrepresentation and lays out the *Bily* factors in terms of negligence and negligent misrepresentation when the [opinion cites] [*Biakanja*]."  Finding that Nolte had no part in drafting section HH and relying on *Weseloh*, the court stated:  "I do not see how [Atlas] has met its burden of proof on foreseeability and duty as it relates to the professional design of Nolte."

fire suppression system incidentally affected Atlas because it resulted in plans and specifications that Atlas was required to follow in constructing the project, the design contract was intended to directly benefit the District and the students and employees of Miramar College, not the contractor retained to construct the system.

The second *Biakanja* factor is foreseeability of harm to the plaintiff. Assuming arguendo that Nolte can be held responsible for section HH, the issue here is the extent to which it was foreseeable that section HH would cause Atlas to underestimate the difficulty of the trenching work and, consequently, underbid the job. We conclude the foreseeability of section HH causing Atlas to underbid the job is minimal. As we discussed, substantial evidence supports the court's finding that Atlas was not misled by section HH because the information in section HH about the difficulty of trenching through "highly cemented gravel and cobble conglomerate" and the likelihood that doing so would "require heavy equipment" was true and put Atlas on inquiry notice to investigate further. It was not foreseeable that the information in section HH would cause a contractor to bid the job based on its lowest manhour coefficient for excavation and a time estimate of 55 days instead of the contract time of 160 days.

The factors of the degree of certainty that Atlas suffered injury and the closeness of any connection between Nolte's conduct and that injury also weigh against a finding that Nolte owed Atlas a duty of care. Although Atlas lost money on the project, it did not suffer a legally compensable injury. In any event, the connection between Atlas's loss and Nolte's conduct is remote. Nolte did not draft section HH, which Atlas claims it relied on in bidding the job based on its being able to complete the project in 55 days.

39

Further, Nolte was unaware that Atlas intended to complete the project early and had no control over Atlas's work on the project.

Regarding the moral blame factor, the *Weseloh* court noted, " 'when a defendant's liability rests partially under the control of another party's conduct and the plaintiff is free to contract with the other party, the defendant's "moral blame" and connection to the plaintiffs' alleged injury is too remote to justify imposition of a tort duty.' " (*Weseloh, supra,* 125 Cal.App.4th at p. 169, quoting *Ratcliff Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 606.) Nolte's alleged liability to Atlas rests largely under the control of the District, which drafted section HH, and Atlas's own conduct in underbidding the job and the manner in which it performed the work. We find nothing in the record to support assigning moral blame to Nolte's conduct.

Nor do we find any reason to conclude that imposing liability on Nolte for alleged deficiencies in specifications it did not draft would prevent future harm. It is well settled that under appropriate circumstances, when a public works contractor bids too low on a project as a result of being misled by incorrect plans and specifications issued by a public agency, the contractor may recover *against the public agency* " 'in a contract action for extra work or expenses necessitated by the conditions being other than as represented.' " (*Los Angeles Unified, supra,* 49 Cal.4th at p. 748.) Imposing tort liability on design engineers for incorrect plans and specifications *prepared by the public agency* is unnecessary to prevent future harm because the policy of preventing such future harm is sufficiently met by imposing liability on the public agency responsible for the incorrect

40

plans and specifications. The *Biakanja* factors support the trial court's determination that Nolte did not owe Atlas a duty of care.

The *Bily* factors or "concerns" also support the court's determination that Nolte did not owe Atlas a duty. Holding Nolte liable to a contractor with whom it was not in contractual privity for faulty technical specifications prepared and issued by the District would impose liability out of proportion to fault and would have a potential adverse impact on design engineers and architects generally as class of defendants. Regarding private ordering or the parties' reliance "on their own ability to protect themselves through their own prudence, diligence and contracting power" (*Adelman v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th at p. 364), imposing liability on Nolte under the circumstances of this case would potentially discourage contractors from protecting themselves through their own prudence and diligence. As we discussed, *ante*, the trial court reasonably found that the statement in section HH indicating its description of the underlying soils was based on "[g]eotechnical investigations for the surrounding improvements" put Atlas on notice to investigate further and that Atlas had every reason to obtain that information because it was based outside San Diego County and had never worked at Miramar College. The *Bily* factors further support the trial court's determination that Nolte did not owe Atlas a duty of care.

At oral argument, Atlas cited the California Supreme Court's recent decision in *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (July 3, 2014, S208173) __ Cal.4th ___ [2014 D.A.R. 8787] (*Beacon*) as supporting the existence of a duty of care owed by Nolte to Atlas. In *Beacon*, a homeowners association on behalf of

41

its members sued, among other defendants, two architectural firms over design defects in the association's homes, including "solar heat gain," which allegedly made the homes unsafe and uninhabitable during certain periods due to high temperatures. In deciding that the trial court erroneously sustained the defendant architects' demurrer to the plaintiff's complaint, the *Beacon* court held that "an architect owes a duty of care to future homeowners in the design of a residential building where . . . the architect is a *principal architect* on the project – that is, the architect, in providing professional design services, is not subordinate to other design professionals." (*Ibid.*)

*Beacon* is distinguishable from the present case and does not support the imposition of negligence liability on Nolte in favor of Atlas. *Beacon* emphasized that the defendants in that case "were the principal architects on the Project. Among all the entities involved in the Project, defendants uniquely possessed architectural expertise. There is no suggestion that the owner or anyone else had special competence or exercised professional judgment on architectural issues such as adequate ventilation or code-compliant windows." (*Beacon, supra,* __ Cal.4th at p. __ [2014 D.A.R. at p. 8792].) Here, the District's knowledge of the site conditions on the project was superior to Nolte's, and *the District*, not Nolte, prepared the technical specifications, including section HH. Thus, Nolte did not "uniquely possess" knowledge and expertise about soils conditions on the project site.

The *Beacon* court explained its holding in large part by contrasting the case before it with *Bily*, in which, as noted above, the Supreme Court held that financial auditors generally do not owe a duty of care to third persons in preparing an independent audit of

a client's financial statements. The *Beacon* court noted that a central concern of the *Bily* court was that an " 'auditor exposed to negligence claims from all foreseeable third parties faces potential liability far out of proportion to its fault . . . .' [Citation.] In elaborating on this concern, the [*Bily*] court observed that 'audits are performed in a client-controlled environment.' " (*Beacon, supra,* at p. __ [2014 D.A.R. at pp. 8790-8791].) In contrast, the *Beacon* court noted that "[a]n architect providing professional design services to a developer does not operate in a 'client-controlled environment' comparable to the relationship between an auditor and its client." (*Id.* at p. __ [2014 D.A.R. at p. 8792].) In the present case, however, the District, as Nolte's client, had far more control over the plans and specifications than a developer typically has in a residential construction project like that in *Beacon*, as underscored by the fact that the District prepared section HH. Thus, the lack of client control discussed in *Beacon* is not present in this case.

The *Beacon* court cited the following alleged facts as supporting negligence liability based on the defendants' "principal role" in the design of the subject project: "[D]efendants not only provided design services at the outset of the Project but also brought their expertise to bear on the implementation of their plans and specifications by doing weekly inspections at the construction site, monitoring contractor compliance with design plans, altering design requirements as issues arose, and advising the owner of any nonconforming work that should be rejected—all for a fee of more than $5 million. In other words, defendants applied their specialized skill and professional judgment *throughout the construction process* to ensure that it would proceed according to

43

approved designs." (*Beacon, supra,* __ Cal.4th at p. __ [2014 D.A.R. at p. 8792], italics added.)  Thus, *Beacon*'s imposition of designer liability to third party homebuyers was based in large part on the substantial control and influence the defendant architects exercised over the actual construction of the project.  Here, Nolte had no control over Atlas's construction of the project.

The *Beacon* court also reasoned that the defendants' work was " 'intended to affect the plaintiff,' and 'the "end and aim" of the transaction was to provide' safe and habitable residences for future homeowners, a specific, foreseeable, and well-defined class." (*Beacon, supra,* __ Cal.4th at p. __ [2014 D.A.R. 8793].)  In contrast, as we discussed above, Nolte's work was not intended to benefit the contractor hired to construct the project; it was intended to directly benefit the District and the students and employees of Miramar College.

Regarding the *Bily* concern of private ordering options, the *Beacon* court observed that "[w]hereas '[i]nvestors, creditors, and others who read and rely on audit reports and financial statements are not the equivalent of ordinary consumers' because 'they often possess considerable sophistication in analyzing financial information and are aware from training and experience of the limits of an audit report "product," ' the average homebuyer is more akin to 'the "presumptively powerless consumer" in product liability cases.' [Citation.]  The typical homebuyer ' "clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation.  He has no architect or other professional adviser of his own, he has no real competency to inspect on his own,

44

his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible." ' [Citation.] . . . '[T]he usual buyer of a home is ill-equipped with experience or financial means to discern . . . structural defects." (*Beacon, supra,* __ Cal.4th at p. __ [2014 D.A.R. at p. 8793].)

Unlike a "presumptively powerless" homebuyer, who lacks the competency to inspect on his or her own, Atlas had the power and ability to protect its interests through its own prudence and diligence, as we discussed above, and it had far more opportunity than a homebuyer to obtain meaningful protective changes in its contract. Atlas could have sought clarification from the District or Nolte about the soils conditions or conducted its own investigation into the soils conditions on and around the project site before submitting its bid. Instead, Atlas chose to prepare its bid without a soils report—a practice it followed in 50 percent of its projects.

Finally, the *Beacon* court noted *Bily*'s recognition that "the sophisticated consumer of audit reports 'might expend its own resources to verify the client's financial statements or selected portions of them that were particularly material to its transaction with the client. Or it might commission its own audit or investigation, thus establishing privity between itself and an auditor or investigator to whom it could look for protection. [Citation.] But it is unrealistic to expect homebuyers to take comparable measures." (*Beacon, supra,* __ Cal.4th at p. __ [2014 D.A.R. at p. 8793].) A public works contractor, like a sophisticated consumer of audit reports and unlike a typical homebuyer, can expend its own resources and undertake its own investigation to protect its interests,

45

including verifying soils conditions and conducting whatever other inquiry it deems necessary before bidding on a project.

*Beacon*'s reasoning supporting the existence of a duty of care owed by a principal architect to future homeowners in the design of a residential building does not support the existence of a duty of care owed by Nolte to Atlas in this case. The court properly entered judgment in favor of Nolte on Atlas's cause of action for negligence.

*Cause of action for negligent misrepresentation*

Atlas contends the court erred in entering judgment on Atlas's negligent misrepresentation cause of action against Nolte on the ground Nolte did not make any misrepresentations. "The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage. [Citation.] In contrast to fraud, negligent misrepresentation does not require knowledge of falsity. A defendant who makes false statements ' "honestly believing that they are true, but without reasonable ground for such belief, . . . may be liable for negligent misrepresentation . . . ." [Citations.]' [Citation.] *However, a positive assertion is required; an omission or an implied assertion or representation is not sufficient.*" (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243, italics added.)

46

Although Atlas does not expressly identify Nolte's alleged misrepresentation in its briefs, its negligent misrepresentation claim presumably is based on section HH.[13]  As we discussed, the *District*, not Nolte, drafted section HH, and the evidence sufficiently supports the court's finding that the section HH did not mislead Atlas because its representation about the underlying soil conditions is not false.  To the extent Atlas was misled by section HH, it was because section HH did not expressly refer to subsurface stadium conglomerate or rock conditions.  However, as noted, negligent misrepresentation liability requires "a positive assertion . . . ; an omission or an implied assertion or representation is not sufficient."  (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC, supra,* 158 Cal.App.4th at p. 243.)  Because the evidence established both that Nolte did not make the positive assertions in section HH and that those assertions were true, the court properly entered judgment in favor of Nolte on Atlas's cause of

---

[13]    In its third amended complaint, Atlas alleges that "Nolte made numerous misrepresentations of fact to [Atlas]."  The alleged misrepresentations include, but are not limited to the following:  Nolte "through its plans, misrepresented the condition of the soil beneath the work of improvement.  On numerous other projects for [the District], soils reports provided information as to the soil where the project was being constructed.  On this project, Nolte provided an inaccurate plan profile that does not show any rock conditions and also inaccurately depicts existing utility depths which are much shallower than are shown on the plan profile.  The majority of existing utilities were installed at a maximum depth of 24" or less due to the rock conditions which typically began at 2' below surface and continued to a depth of over 6' which [Atlas] encountered in over 90% of [its] work.  In this case, large rocks and extremely hard earth materials, among other things, made it impossible to construct the project as contemplated by the contractor at the time of the bid and in the time frame called for in the plans and specifications, which caused [Atlas] substantial damages."  Atlas has not raised any issue regarding utility depths in this appeal.

47

action for negligent misrepresentation on the ground Nolte did not make any misrepresentations.

## IV. *Denial of a New Trial on the Ground Nolte Was Acting as the District's Ostensible Agent*

Atlas contends the court erred in not granting a new trial on the ground Nolte was acting as the ostensible agent of the District. We review an order denying a motion for new trial for abuse of discretion. (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 733.)

Atlas first raised the issue of whether Nolte acted as the District's ostensible agent in its motion for new trial against Nolte. A court may consider a new legal theory on a new trial motion so long as the new theory presents a question of law based on undisputed facts. (*Hoffman-Haag v. Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10, 15-16.) However, whether an ostensible agency exists is generally a question of fact. (*Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 748; *Walker v. Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 999.) Thus, the trial court did not abuse its discretion in denying a new trial on the newly raised issue of ostensible agency.

Moreover, a finding that Atlas was the ostensible agent of the District would not help Atlas's case against Nolte because it would simply provide a basis for holding the *District* liable for acts of Nolte. Atlas seeks a reverse application of the ostensible agency principle—i.e., to hold Nolte liable as the District's *agent* for the District's drafting of section HH. As Atlas points out, an agent may be held liable for its own torts whether the

principal is liable or not (Civ. Code, § 2343, subd. 3; *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 68), and a principal may be held liable for the acts of its ostensible agent (Civ. Code, § 2338; *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 426-427). However, Atlas cites no authority for the proposition that an ostensible agent may be held liable for the acts of its principal. In any event, Atlas's reverse theory of vicarious liability is unnecessary because Atlas directly sued Nolte. The court did not abuse it discretion in not granting Atlas's motion for new trial on the ground Nolte acted as the District's ostensible agent.

## DISPOSITION

The judgment in favor of the District is affirmed. The judgment in favor of Nolte is affirmed. The District and Nolte are awarded their costs on appeal.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

IRION, J.

49